# CASES DETERMINED

BY THE

# SUPREME COURT

OF THE

## STATE OF MISSOURI

AT THE

APRIL TERM, 1903.

*(Continued from Volume 176.)*

THE STATE ex inf. CROW, Attorney-General, v.
CONTINENTAL TOBACCO COMPANY et al.

In Banc, July 3, 1903.

1. **Trusts and Monopolies: ANTI-COMBINATION STATUTE CONSTITU-
TIONAL: EXCEPTION.** Because the statute of 1897 (Laws 1897, p.
208) against an illegal combination, trust, or pool to regulate the
price of articles, excepts the rates of fire insurance companies in
cities of 100,000 inhabitants from the penalties prescribed, it is
not unconstitutional.

2. ———: **CONSOLIDATION OF CORPORATIONS.** The anti-combination
statute (Laws 1897, p. 208) which prohibits any corporation, part-
nership or individual from creating or entering into any pool,
trust, agreement, combination, confederation or understanding with
any other corporation, partnership or individual, "to regulate or
fix the price of any article of manufacture . . . or to main-
tain such price" when so fixed and regulated, or to fix or limit
the quantity of any article of manufacture, is not broad enough
to prohibit one corporation, in good faith, in the legitimate pur-

suit of its business, from purchasing the assets of another corporation in a similar business. The prohibition to fix and maintain the price of an article does not include a prohibition against one manufacturing company selling out its business to another. If that were true, since this statute applies alike to corporations, individuals and partnerships, it must follow that it also prohibits one individual from selling the assets of his business to another engaged in producing a like article.

3. ————: ————: FOREIGN CORPORATIONS: POWERS IN THIS STATE. A corporation organized under the laws of another State with authority to buy, manufacture and sell tobacco, and to own, maintain and operate such plants, machinery and warehouses as may be necessary to a proper conduct of its business, when authorized to do business within this State, necessarily brings those powers with it into this State, unless restricted from exercising them within this State by its laws, and there being no restrictions against its exercise of the powers to purchase such property, plants or machinery as may be necessary to the conduct of its business here, it could exercise that power by purchasing the plants, trade-marks, business and other assets of like corporations within this State.

4. ————: CORPORATIONS: PURCHASING PLANTS OF OTHERS. The purchase by one corporation of the plants of another, if done in good faith, in the legitimate conduct and management of its business, is the exercise of a legal right.

5. ————: ————: ORGANIZATION: TRUST. The laws of Missouri are broad enough to reach individuals who undertake to organize a corporation that would create a trust in itself. But where the company is duly organized, then the condemnation which the statute pronounces is not in the method of its organization, but in the exercise of its unlawful acts as an existing legal corporation.

6. ————: NATURE OF PROCEEDING: PROOF. A proceeding by the Attorney-General to oust a corporation from the exercise of its franchise, as being a trust and an illegal combination, partakes of the nature of a criminal prosecution, and should be sustained only on a clear showing by testimony fully satisfying the mind of the court.

7. ————: FOREIGN CORPORATIONS: PRODUCTION OF WITNESSES AND PAPERS: APPLICATION OF STATUTE. The constitutionality of the statute (sec. 8983, R. S. 1899) giving the Attorney-General the right, in any proceeding, begun against a corporation under the law against the formation and maintenance of pools, trusts and combinations, to apply to the court or commissioner appointed to take testimony, for an order compelling any officer of such corporation residing out of this State to appear and testify and to produce the books of such company, is not determined in this case; but it

is held that before the court should make such order and issue its process in aid thereof, it should require that the application therefor show not only the materiality of the testimony but the competency of the witnesses. The statement that the president or secretary of such corporation can furnish valuable testimony is not sufficient.

## Quo Warranto.

WRIT DENIED.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for informant.

(1) The objection made by respondents to the effect that the order was improperly and improvidently made can not be seriously considered for the reason that if the statute be legal the statement of the Attorney-General to the effect that said witnesses and books were necessary and material to the controversy would be sufficient to authorize the commissioner in executing the order. This statute permits the application on the part of the Attorney-General and not only authorizes the commissioner to make the order requiring the production of witnesses therein designated, but makes it mandatory that said order be made, provided, of course, that the persons named as witnesses are without the jurisdiction of the court and of the judicial authorities of the State and occupy the positions towards respondents designated by the statute. There is sufficient in both the application and the order of the court to require respondents to produce the witnesses. The requirements of the statute are fully covered, and no complaint can be successfully urged. It is unnecessary to set out the evidence expected to be shown by such witnesses; the discretion and right belongs to the Attorney-General, and it does not rest in the hands of respondent or of the court to determine the character of the testimony to be obtained. Service can be had and orders can be enforced against corporations only by certain

exactions and requirements of their officers. There is no other available means. To concede respondent's position would necessarily forestall all power of the State and its court over corporations or corporate property. 3 Cook on Corporations, sec. 578; St. Clair v. Cox, 106 U. S. 350; Bank v. Huntington, 129 Mass. 444. Corporations organized in other States transact business in this State only by comity or by express statutory authority. They can be excluded from maintaining an office in this State, or permitted to do so, under such terms as may be prescribed by law of this State. In migrating to this State the Continental Tobacco Company has by implication subscribed to the conditions and requirements of not only such laws as were in existence at the time of its admission into the State, but also to laws that may be subsequently enacted looking towards a proper government, governmental powers of the State. 2 Cook on Corporations, sec. 696; Runyan v. Coster, 14 Pet. 122; Diamond Match Co. v. Powers, 51 Mich. 145; Stevens v. Pratt, 101 Ill. 206. The State does not have visitorial power over the affairs of private citizens or individuals, but it does have such power over corporations created by it and doing business under its direction or by its consent. Corporations and their powers emanate from the State and are subject to the State's control. This visitorial power is always exercised through the medium of the courts, so far as private corporations are concerned. Kent's Commentaries, 300; Little v. Whittler, 77 Va. 413; State v. Milwaukee Chamber of Commerce, 47 Wis. 650. In the exercise of this visitorial power the State has a right to information essentially necessary to determine whether or not the corporation is conducting its business in a lawful manner, for if it is not so conducting its business, it should be excluded from the State.. If the Continental Tobacco Company is violating the law of this State, its license to do business in this State should be revoked, and the court has a right to determine that

fact, by a visitation upon it. (2) Where the same interests are controlled by the same persons in a federated capacity, so as to enable the maintenance of fixed or agreed prices, the law is violated, it matters not how that condition may be arrived at. The holding corporation (Continental Tobacco Company) then succeeds to or becomes a trust, and its operations are carried on in the same way, and the business conducted by the same agencies as before. This constitutes a combination, pool or trust, which is not recognized by law, either common or statutory. D. & C. F. Co. v. People, 156 Ill. 448; Collier v. Company, 11 Hun 397; Strait v. Harrow, 18 N. Y. (Sup.) 224; Richardson v. Buhl, 77 Mich. 632; Clancy v. Salt Co., 62 Barb. 395. When the fact is shown that the holding company is managed and controlled by a directorate consisting of the same persons as were the controlling owners of the subordinate companies, which transferred all of their property to the holding company, it makes no material difference whether the sale be made for cash or for stock, or whether a technical delivery of the property was made for cash and a redelivery of the money for stock in the holding corporation. These are only different ways by which the illegal act is made possible. The question, in the light of the decisions to be determined here is, was there a concerted effort upon the part of the persons who organized and became interested in the Continental Tobacco Company to make the purchase as stated in informant's petition, and by that means control the output of plug tobacco, and thereby fix, maintain and control the agreed price of the manufactured article? The above proposition was thoroughly discussed before this court in the demurrer to the information, and we take it as being unnecessary to present further authorities than there cited at this time. (3) The Act of 1897, making it illegal for persons to enter into a combination, pool or trust to control prices, is not in conflict with either the State or Federal Constitutions. It was

so determined in this court in the case of State ex inf. Attorney-General v. Firemen's Fund Insurance Company, 152 Mo. 1. But should this court at this time determine the act to fall within the purview of the late decision of the United States Supreme Court and be declared invalid on account of exempting the business of fire insurance companies in cities of more than one hundred thousand inhabitants, the common law would remain.

*H. S. Priest* for Continental Tobacco Company, respondent; *W. W. Fuller, Martin L. Clardy* and *Boyle, Priest & Lehmann* of counsel.

There is but one statement in the information which indicates any purpose on the part of the pleader to charge a combination under the "Anti-Trust Act," and that is, that the defendant Continental Company is of itself a trust formed by certain persons. This is a mere statement of opinion, not of fact. Moreover, this defendant was brought in in its corporate name, under an averment that it was duly organized under the laws of New Jersey with a statute corporate purpose. That it is such corporation can not now be questioned. Van Ripper v. Parsons, 40 N. J. L. 1. Again, where a corporation is brought into court by its corporate name, and under allegations such as are made in the information in this case, its corporate existence is thereby admitted, and no inquiry can be made into the regularity of the proceedings by which it attained this legal entity. Distilling Co. v. People, 156 Ill. 448; Draining Co. v. State, 43 Ind. 236; People v. Sanford, 19 Pac. 693.

### STATEMENT.

On February 14, 1899, the following information was filed in this court:

"Now at this day comes Edward C. Crow, Attorney-General of the State of Missouri, and informs the

court that the Continental Tobacco Company is a corporation organized under and by virtue of the laws of the State of New Jersey; and that said J. G. Butler Tobacco Company, Brown Tobacco Company, Drummond Tobacco Company, and Wright Brothers Tobacco Company, are corporations organized under and by virtue of the laws of the State of Missouri.

"The plaintiff states that all of said named respondents were so, severally, organized as corporations for the purpose of buying, manufacturing and selling tobacco; and were and are authorized to own, maintain and operate such plants, machinery, warehouses, etc., as may be necessary to the proper conduct of their several businesses. The plaintiff states that the said Continental Tobacco Company is carrying on its said business of buying, manufacturing and selling tobacco, as a foreign corporation, within the State of Missouri; and that said J. G. Butler Tobacco Company, Brown Tobacco Company, Drummond Tobacco Company, and Wright Brothers Tobacco Company were organized under the laws of the State of Missouri, as aforesaid, for the purpose of carrying on the business of buying, manufacturing and selling tobacco in said State, and have since been carrying on said business in said State.

"Plaintiff, for cause of action herein, states, that about the year 1890, and for many years prior thereto, there were certain five distinct and separate corporations or copartnership companies, to-wit: Allen & Ginter, located at the city of Richmond, Virginia; W. Duke Sons & Co., located at the city of Durham, North Carolina; W. S. Kimball & Co., located at the city of Rochester, New York; and Goodwin & Co., and Kinney Brothers, each located at the city of New York, New York, all severally engaged in the business of manufacturing cigarettes and smoking tobacco; and also severally engaged in selling the products of their respective factories throughout the United States.

"Plaintiff further states that on or about the year

1890 the said five last-named corporations or copartner-
ship companies were merged and consolidated into one
corporation, to-wit, into the American Tobacco Com-
pany, which was then at that date organized as a cor-
poration under the laws of the State of New Jersey.
Plaintiff alleges the fact to be that said American To-
bacco Company was organized as a corporation, as
aforesaid, with the object and purpose on the part of
the incorporators of absorbing, combining and consoli-
dating said five corporations or copartnership compan-
ies into one holding, and to place the same under the
control and management of a single directory, and this
with the further object and purpose thereby and by
means of said combination to limit and control the pro-
duction and price of cigarettes and smoking tobacco.
Plaintiff states that after the organization of said
American Tobacco Company, to-wit, about the year
1899, the business and properties of said above-named
five corporations or copartnership companies were
transferred to the said American Tobacco Company,
and thereafter were, and ever since have been, under
the management, direction and control of said Ameri-
can Tobacco Company.

"Plaintiff states that since the year 1890 numerous
other corporations and copartnership companies, organ-
ized and existing in different States of the Union, for
the purpose of manufacturing and selling cigarettes and
smoking tobacco, and which were severally engaged in
said business as separate and independent concerns,
have also transferred their business and properties to
said American Tobacco Company. Plaintiff states
that said transfers of the business and properties of all
of said corporations and copartnership companies to
said American Tobacco Company were made with the
object, purpose and intention of effecting a combination
or trust so as to limit or destroy competition in the busi-
ness of manufacturing and selling cigarettes and smok-
ing tobaccos, and thereby to enable the said American

Tobacco Company to acquire a monopoly of said business throughout the United States; and plaintiff alleges that by reason of the premises the said American Tobacco Company has in fact acquired, and now has, a virtual monopoly of said business of manufacturing and selling cigarettes and smoking tobaccos throughout the United States.

"Further complaining the plaintiff says that the said American Tobacco Company, having thus acquired a virtual monopoly of said business of manufacturing and selling cigarettes and smoking tobaccos as aforesaid, then and thereafter, to-wit, between the years 1893 and 1898, organized and prosecuted a systematic plan or scheme, as hereinafter stated, to combine and bring under its control and direction the principal and leading corporations and copartnership companies, existing in the different States of the United States, which were engaged in the business of manufacturing and selling plug chewing tobaccos. Plaintiff says that between the years 1893 and 1898, and prior thereto, there were a large number, to-wit, about the number of — corporations and copartnership companies organized and existing in the different States of the United States engaged as separate and independent concerns in the business of manufacturing and selling plug chewing tobaccos. That prior to about the year 1893 the business of manufacturing and selling smoking tobaccos, in the form of cigarettes, packages and other forms, and the business of manufacturing and selling plug chewing tobaccos, were carried on and conducted as different and distinct lines of manufacture, certain corporations and copartnership companies being engaged exclusively in the manufacture and sale of smoking tobaccos, and certain other corporations and copartnership companies being engaged exclusively in the manufacture and sale of plug chewing tobaccos, and that the two lines of manufactures were rarely, if ever, combined in the business of

any one of such corporations or copartnership companies.

"Plaintiff states that in furtherance of its said plan or scheme to combine and bring under its control the principal and leading corporations or copartnership companies engaged throughout the United States in the business of manufacturing and selling plug chewing tobaccos, the said American Tobacco Company, about the year 1893, obtained control by purchase of the National Tobacco Works, theretofore under the management of Pfingst, Doerhofer & Co., a corporation organized under the laws of Kentucky, and engaged in the business of manufacturing and selling plug chewing tobacco. Plaintiff states that after it had so obtained control of the said National Tobacco Works, the said American Tobacco Company, through its officers, thereto duly authorized, proposed to all the leading and principal corporations and companies engaged in the several States of the Union in manufacturing and selling plug chewing tobacco, to sell their business and properties to it, or to combine with it in organizing and effecting a combination or trust to control and monopolize under a single or common directory and management the said business of manufacturing and selling plug chewing tobacco throughout the United States; and plaintiff says that said American Tobacco Company, at the time of making its said proposal to said corporations and companies to buy their business and properties, or to combine with them as aforesaid, threatened said corporations and companies, or many of them, that if they refused to agree to said proposal the said American Tobacco Company would sell on the markets of the country the plug chewing tobaccos manufactured by it at prices far below the cost of production, thereby entailing heavy losses on said other corporations and companies engaged in said business as its competitors, and that thereby and by means thereof it would compel and coerce said corporations

and companies to sell their business and properties to it, or to combine with it as aforesaid for the purposes aforesaid.

"Plaintiff states that all of said corporations and companies to which said American Tobacco Company made said proposal as aforesaid, at that time rejected the same, and refused either to sell their business and properties to, or to enter into any combination with, the said American Tobacco Company. And plaintiff states that thereafter, in furtherance of its' threat to coerce and compel its said competitors to sell to or combine with it as above stated, the said American Tobacco Company did sell for general consumption the plug chewing tobaccos manufactured by it, through the said National Tobacco Works, in enormous quantities at prices greatly below the actual cost of producing the same. Plaintiff states that the trade war thus inaugurated by said American Tobacco Company in the manner and for the purposes aforesaid has been carried on and maintained by it for a long period of time, to-wit, since about the year 1893, at a large loss to the said American Tobacco Company; and plaintiff says that in being compelled to meet the injurious competition thus forced upon them, the corporations and companies engaged as competitors of the said American Tobacco Company in the manufacture and sale of plug chewing tobaccos were forced to resort to new expedients, to incur extraordinary expenses, and suffer heavy losses, amounting to many thousands of dollars, in defending and protecting their trade, business and properties against the attacks made thereon as aforesaid by the said American Tobacco Company. Plaintiff states that said American Tobacco Company was better prepared and more able to carry on said trade war than were its competitors engaged in manufacturing and selling plug chewing tobaccos, because, as plaintiff alleges, said American Tobacco Company during all the period since 1893, has been receiving large profits, amounting to many mil-

lions of dollars, from its business of manufacturing and selling cigarettes and smoking tobaccos, of which business it has acquired a virtual monopoly as aforesaid. Plaintiff states that about the year 1895, the said J. G. Butler Tobacco Company, located at the city of St. Louis, State of Missouri, sold and transferred its business and property to the said American Tobacco Company, and has been ever since under the control and operated by the said American Tobacco Company.

"Plaintiff states that during the year 1898 the said American Tobacco Company succeeded in purchasing the business and properties, or in purchasing a majority of the capital stocks, and thereby obtaining control of the business and properties, of a large number of the principal and leading corporations and copartnership companies engaged in the several States of the United States in the business of manufacturing and selling plug chewing tobacco. That among the corporations and companies whose business and properties, or the majority of the capital stocks of which, the said American Tobacco Company purchased in the year 1898 as aforesaid, are the following, to-wit: John Finzer & Brothers, located at the city of Louisville, State of Kentucky; P. J. Sorg & Co., located at the city of Middletown, State of Ohio; P. H. Mayo & Brother, located at the city of Richmond, State of Virginia; Daniel Scotten & Co., located at the city of Detroit, State of Michigan; P. Lorillard Co., located at the city of Jersey City, State of New Jersey; Brown Tobacco Company, located at the city of St. Louis, State of Missouri; and Drummond Tobacco Company, also located at the city of St. Louis, State of Missouri; and plaintiff says, that, in addition to the foregoing, the said American Tobacco Company purchased the business and properties, and purchased and acquired control of a majority of the capital stocks of other corporations and copartnership companies engaged in manufacturing and selling plug chewing tobaccos in the States of Louisiana, Kentucky, Virginia,

and in other States, to-wit, during the year 1898; but plaintiff is unable to state definitely the names and exact locations of said corporations and companies.

"Plaintiff states that the business, capital stocks and properties of the said corporations and companies so purchased by said American Tobacco Company during the year 1898 as aforesaid, were, respectively, transferred and delivered to said American Tobacco Company by the several owners thereof, and the said American Tobacco Company entered into the possession, management and control thereof.

"Plaintiff states that by reason of the premises the said American Tobacco Company came into the possession, management and control during the year 1898, of manufacturing plants and properties which produced, and are capable of producing, about sixty-six per cent of the total annual manufactured product of plug chewing tobaccos throughout the United States.

"Plaintiff states that at the time of the purchase by said American Tobacco Company of the business, capital stocks and properties of said corporations and copartnership companies, during the year 1898, as aforesaid, it was understood and agreed between the said buyer and sellers thereof that the business and properties of all said corporations and companies so sold to said American Tobacco Company, as well as all other manufacturing plants and properties owned or controlled by said American Tobacco Company and used by it in manufacturing plug chewing tobacco, should be merged, consolidated and transferred to a new corporation to be organized for that purpose; and plaintiff states that the individuals who owned, or were interested in said business, capital stocks, and properties of the corporations and companies which were sold and transferred to said American Tobacco Company as aforesaid, contracted and agreed with said American Tobacco Company, as part consideration of said sales and transfers, that they would subscribe to

and receive portions of the capital stock of said new corporation, so to be formed as aforesaid, in payment or in part payment, of the business, stocks and properties so sold by them to said American Tobacco Company; and that said individuals also at the same time, and as a part of said contracts of sale, contracted and agreed that they would not at any future time engage in the manufacture or sale of tobacco in competition with said American Tobacco Company, or with any corporation to which said American Tobacco Company might thereafter assign and transfer the business, capital stocks and properties so purchased and acquired by it.

"Plaintiff states that after the sale and transfer by said named corporations and companies of their business and properties to the said American Tobacco Company as aforesaid, to-wit, during the year 1898, the officers and others who were interested as stockholders or otherwise in the business and properties of said American Tobacco Company, and in the business and properties of the said corporations and companies which had been sold to said American Tobacco Company as aforesaid, did organize a new corporation in the State of New Jersey, under and by virtue of the laws thereof, to-wit, the said Continental Tobacco Company, one of the respondents herein. And plaintiff states that thereafter, to-wit, on the ———— day of December, 1898, the said American Tobacco Company assigned and transferred to said Continental Tobacco Company all business and properties theretofore acquired by it through purchase or otherwise, which were held and used for the purpose of manufacturing plug chewing tobaccos; and plaintiff says that at the time of making said transfer the said American Tobacco Company received in payment of said business and properties so transferred a large amount, to-wit, a majority, of the capital stock of said Continental Tobacco Company; and plaintiff also states that in accordance with the contracts and agreements made to that effect, as

hereinbefore stated, large amounts of the capital stock of said Continental Tobacco Company were also delivered to officers and others who were interested in the stocks, business and properties of the several corporations and companies whose capital stocks, business and properties were purchased by said American Tobacco Company, as aforesaid.

"Plaintiff states that since the organization of said Continental Tobacco Company the said American Tobacco Company has been, and now is, engaged exclusively in the business of manufacturing and selling cigarettes and smoking tobaccos; that the said Continental Tobacco Company is engaged exclusively in the business of manufacturing and selling plug chewing tobaccos; that the two lines of manufactures are thus separated, one being carried on by said American Tobacco Company, and the other being carried on by said Continental Tobacco Company.

"Plaintiff states that the business and properties now owned or controlled by said Continental Tobacco Company is composed in whole or in part of the capital stocks, business, manufacturing plants and other properties formerly owned by said American Tobacco Company, and which it acquired by purchase from other corporations, companies and individuals engaged in manufacturing and selling plug chewing tobaccos, as aforesaid.

"Plaintiff states that the board of directors of said Continental Tobacco Company is composed of the officers and stockholders of the said American Tobacco Company, and of the officers and directors of the said corporations and companies whose business and properties were purchased by said American Tobacco Company as aforesaid, and thereafter transferred by said American Tobacco Company to said Continental Tobacco Company as aforesaid; and plaintiff states that one J. B. Duke is the president and chief executive offi-

cer of both the said American Tobacco Company and the said Continental Tobacco Company.

"Plaintiff states that since the Continental To-bacco Company was organized, to-wit, on the —— day of January, 1899, it purchased the business and property of the said Wright Brothers Tobacco Com-pany, and has entered into, and now has, the possession, use and control thereof. And plaintiff states that dur-ing the year 1899 the said Continental Tobacco Com-pany has also purchased and entered into, and now has, the possession, use and control of the business and prop-erties of other corporations and companies which ex-isted and were engaged outside the State of Missouri in manufacturing and selling plug chewing tobacco.

"Plaintiff states that a majority of the several cor-porations whose business and properties were pur-chased by the said American Tobacco Company and the said Continental Tobacco Company, between and in-cluding the years of 1895 and 1898, as aforesaid, still maintain their corporate existence, but that their sev-eral affairs are conducted and carried on under and subject to the control of the said Continental Tobacco Company.

"Plaintiff states that the said Continental Tobacco Company, since it purchased the business and proper-ties of the said Wright Brothers Tobacco Company, on the —— day of January, 1899, has closed the factor-ies of said Wright Brothers Tobacco Company and dis-continued the manufacture of tobacco therein.

"Plaintiff states that the manufacturing plants and properties transferred to the said American To-bacco Company by the said J. G. Butler Tobacco Com-pany, the said Brown Tobacco Company, and the said Drummond Tobacco Company, as aforesaid, and which were thereafter transferred by said American Tobacco Company to said Continental Tobacco Company as aforesaid, are now being, and for a long time past have

been, used and operated under the direction and control of said Continental Tobacco Company in manufacturing plug chewing tobaccos, to-wit, in the said city of St. Louis, State of Missouri, and that the said plug chewing tobaccos so manufactured are being sold throughout the State of Missouri under the direction and control and on account of the said Continental Tobacco Company.

"Plaintiff states that the said J. G. Butler Tobacco Company is now being run, managed and operated by the said Continental Tobacco Company as the J. G. Butler Company branch of the Continental Tobacco Company; and that the said Brown Tobacco Company is now being run, managed and operated by the said Continental Tobacco Company as the Brown branch of the Continental Tobacco Company; and that the said Drummond Tobacco Company is now being run, managed and operated by said Continental Tobacco Company as the Drummond branch of the Continental Tobacco Company.

"Plaintiff further states that the said Continental Tobacco Company is now, and for a long time past has been, engaged in the business of selling plug chewing tobaccos within the State of Missouri, which are manufactured by said Continental Tobacco Company outside the State of Missouri, that is, tobaccos manufactured by it in and by use of the said several manufacturing plants located in the cities of Louisville, Kentucky; Middletown, Ohio; Richmond, Virginia; and Jersey City, New Jersey, which were assigned and transferred to it by the said American Tobacco Company as aforesaid.

"Plaintiff states that the said Continental Tobacco Company constitutes and is an unlawful trust or combination formed and created by the said American Tobacco Company, the said John Finzer & Brothers, the said P. J. Sorg Company, the said P. H. Mayo &

Brother, the said Daniel Scotten & Company, the said P. Lorillard Company, the said J. G. Butler Tobacco Company, the said Brown Tobacco Company, the said Drummond Tobacco Company, and other corporations, companies and persons to this plaintiff now unknown. Plaintiff states that said unlawful trust or combination so formed and created as aforesaid was created, and is now maintained, for the purpose of limiting the amount of plug chewing tobaccos which should be manufactured in the State of Missouri, and through the United States, and for the purpose also of regulating or fixing the price of raw tobacco, and of manufactured plug chewing tobacco, within the State of Missouri, and throughout the United States; and plaintiff further states that said unlawful trust or combination was created, as aforesaid, also for the purpose and with a view to lessening full and free competition both in the manufacture and sales of plug chewing tobaccos within the State of Missouri, and throughout the United States, and for the purpose and with a view of acquiring a monopoly of the business of manufacturing and selling plug chewing tobacco within the State of Missouri and throughout the United States; and plaintiff further states that said unlawful trust or combination does in fact lessen and tends to lessen full and free competition in the sale of raw tobacco to manufacturers and also both in the manufacture and sale of plug chewing tobacco within the State of Missouri, and throughout the United States, and that by reason thereof, the said unlawful trust or combination created, as aforesaid, creates and tends to create a monopoly in said trust or combination of the business of manufacturing and selling plug chewing tobacco. Plaintiff states that raw tobacco and plug chewing tobacco are articles of manufacture and merchandise.

"In consideration of the premises the plaintiff states and charges the fact to be that the said trust or combination, to-wit, the said Continental Tobacco Com-

pany, was created and is now maintained as aforesaid, to the detriment of the public and against the public policy of the State of Missouri, and contrary to and in violation of the statute laws of the State of Missouri, and also contrary to and in violation of the general common law in force in the State of Missouri.

"Plaintiff further states that since the creation of said unlawful trust or combination, the said Wright Brothers Tobacco Company has entered into and become a part thereof.

"Wherefore, in consideration of the whole premises, the plaintiff prays that the court will issue its writ to all said respondents commanding each and all of them to show cause why the court should not render its judgment forfeiting their respective corporate rights, franchises and privileges; and upon the hearing hereof the plaintiff prays the court to render its judgment forfeiting the corporate rights, franchises and existence of the said J. G. Butler Tobacco Company, the said Brown Tobacco Company, the said Drummond Tobacco Company, and the said Wright Brothers Tobacco Company, and to oust the said named corporations of all and singular their corporate rights and franchises, so that the same shall thereafter become void and of no effect, cease and determine; and that the court will also render its judgment forfeiting the right and privilege of the said Continental Tobacco Company to do business in the State of Missouri.

"And the plaintiff prays that the Court will also render its judgment ousting the said Continental Tobacco Company, the said J. G. Butler Tobacco Company, the said Brown Tobacco Company, the said Drummond Tobacco Company and the said Wright Brothers Tobacco Company, and each of them, from the franchise and privilege of manufacturing plug chewing tobacco within the State of Missouri; and also ousting and depriving them and each of them from the franchise and privilege of selling within the State of

Missouri any plug chewing tobacco manufactured by them, or either of them, within said State; and also ousting them and each of them from the franchise and privilege of selling any plug chewing tobacco whatever within the State of Missouri; and that the court will make such other and further orders, judgments and decrees as may be necessary and proper.

"Plaintiff also prays judgment against said respondents for the costs of this suit."

Respondents were duly served with process. After the disposition of numerous preliminary motions, respondents filed separate answers to the information. It is unnecessary to burden this opinion by quoting them herein. It will be sufficient to say that they directly put in issue the averments in the information, which attributed to them the creation of any trust or combination, in respect to their business, in violation of any statute law of the State of Missouri, or in violation of the general common law in force in this State.

After the issues were joined, as presented by the information and answers filed herein, this court appointed Hon. John P. Butler special commissioner to take the testimony in said proceeding and report his findings to this court. In pursuance of said appointment, the commissioner proceeded at various times and places, to hear the testimony. After a patient and considerate hearing of the testimony, the commissioner, on the 18th day of April, 1902, filed his report, which is as follows:

"Now, to-wit, on this 14th day of April, 1902, comes John P. Butler, heretofore appointed referee and special commissioner in the above-entitled cause, and reports to the honorable the Supreme Court of Missouri, that soon after his appointment he duly qualified and entered upon the discharge of the duties enjoined upon him by the order of reference; that from time to time and at various places he has taken evidence, on the part of the informant, and none on the part of the

respondents, save and except only such as may have been gleaned from the examination of witnesses for the informant on cross-examination.

"Your referee and special commissioner is informed, that if the conclusions of law reached by him during the progress of this case, and made manifest by his rulings herein, are confirmed by the Supreme Court, no further attempt to produce evidence for the informant will be made, and as the respondents nor either of them, have expressed any desire to submit any evidence in rebuttal, the following finding of facts and conclusions of law arising upon the pleadings, admissions of record and undisputed facts, are respectfully submitted for your confirmation, rejection or further direction:

"1.   The American Tobacco Company was and is a corporation organized and existing under the law of New Jersey, with authority, among other things, to purchase and operate tobacco factories and warehouses; to cure, manufacture and sell all kinds of chewing and smoking tobacco.   The exact date of its charter has not been proven, but it is shown by the evidence to have been engaged in business as far back as 1889.

"In 1895 the above-named American Tobacco Company purchased for cash the property, trade-marks, business and good will of the respondent, the J. G. Butler Tobacco Company, a corporation under the laws of Missouri, and doing business in St. Louis, and since the said sale and purchase the said J. G. Butler Tobacco Company has ceased to exist as a corporate entity under its charter.

"In September, 1898, the American Tobacco Company made a like purchase for cash, of the property, trade-marks, business and good will of the respondent, the Drummond Tobacco Company, a corporation under the laws of Missouri, and doing business at the city of St. Louis, and the latter likewise ceased to do business as a separate entity under its charter.

"In October, 1898, the American Tobacco Com-

pany, by a purchase for cash, became the owner of the property, trade-marks, business and good will of the respondent, Brown Brothers Tobacco Company, a corporation under the laws of Missouri, and doing business at St. Louis, and after that time the last-named company also ceased to do business as a separate concern under its charter, which by its own limitation expired in February, 1901.

"December 10, 1898, the respondent, the Continental Tobacco Company, was formed under the laws of New Jersey with a capital of $75,000,000, with power and authority to do a general tobacco business, to own, hold, purchase factories, warehouses, etc., without limitation as to situation of property.

"December 28, 1898, the Continental Tobacco Company purchased of and from the American Tobacco Company all of its property, trade-marks, business and good will relating to the production and manufacture of plug chewing tobacco, the American Tobacco Company retaining that portion of its property and business relating to the production and manufacture of all kinds of smoking tobacco.

"January 6, 1899, the respondent, the Continental Tobacco Company, filed its articles of association with the Secretary of State for the State of Missouri, and was by the latter given a certificate authorizing it to do business in Missouri, in accordance with its charter.

"In January, 1899, the exact date not shown, the Continental Company purchased for cash the property, trade-marks, business and good will of the respondent, Wright Brothers Tobacco Company, a Missouri corporation doing business at St. Charles, Missouri, and after this sale and purchase the last-named likewise ceased to do business under its charter.

"The selling companies, the respondents other than the Continental, at the time of their sale and absorption by the purchasing companies, were doing a

large and lucrative business in their respective lines of trade.

"February 14, 1899, this suit was filed, only forty-eight days after the purchase by the Continental from the American, and within forty days of the time it was granted a certificate to do business in Missouri.

"From the short space of time intervening between the time of the acquisition by the Continental of the property of the other respondents until the bringing of this suit, your referee has been unable to reach a conclusion as to the ultimate results of these purchases by the Continental Tobacco Company. It is shown, however, that the price of plug chewing tobacco decreased within that time (taking into account the increase in internal revenue taxes). This was, of course, beneficial to the tobacco user, but whether a like benefit resulted to the tobacco grower is not demonstrated by the evidence.

"Your referee has excluded all evidence in relation to properties purchased since the filing of this suit, February 14, 1899, for the reason, that if this suit can be maintained at all, it must be founded upon a cause of action existing at the time it was instituted, and not upon after-occurring facts.

"To these finding of facts and conclusions of law the Attorney-General excepted and still excepts.

"The several purchases hereinbefore referred to, whereby the property of the other respondents became vested in the Continental Tobacco Company, having been for cash, your referee is of the opinion, and so holds as a matter of law, that such sales and purchases were not unlawful, and that a person may freely do with his own whatsoever he will, provided, he does not use it in derogation of common right, and to the detriment of the general welfare.

"To which finding of facts and conclusions of law the Attorney-General excepted and still excepts.

"2. During the progress of this case before the referee and on the 25th day of February, 1901, the Attorney-General filed his petition asking an order to compel the attorneys of record for the Continental Tobacco Company, to produce J. B. Duke, president, and W. H. McAlister, secretary, together with certain books, records, papers and documents of said company at the law office of Boyle, Priest & Lehmann, and to submit the said witnesses, and as well, also, the said books, papers, etc., for examination and inspection, further alleging in his petition that said witnesses were residents of the State of New York and that the general offices where said books, etc., were kept were likewise in the said State of New York.

"In compliance with the petition, and at the time of its presentation, your referee made the order requiring the attorneys of record, namely, Boyle, Priest & Lehmann, of St. Louis, Missouri, to produce the witnesses, books, papers and records, etc., at the time specified in the order. Afterwards the respondent Continental Tobacco Company filed its motion to set aside and annul the said order. In support of this motion the respondent submitted a brief as to the law, and the Attorney-General likewise submitted a brief in opposition thereto.

"The matter was continued from time to time for various reasons until March 6, 1902, when your referee after mature consideration of the law of the case sustained the motion and set aside, cancelled and annulled the order of February 25, 1901, requiring the production of books, papers, witnesses, etc., on the ground that the statute authorizing such procedure, to-wit, the act approved May 4, 1899 (Laws 1899, p. 318), and incorporated as new sections 8993, 8994, and 8995, Revised Statutes 1899, was unreasonable, oppressive, unconstitutional and void.

"Your referee's conclusions of law in this regard are grounded upon and supported by the following au-

thorities: Wilson v. Railroad, 108 Mo. 588; State ex rel. v. Simmons Hardware Co., 109 Mo. 118; State v. Young, 119 Mo. 520; Matthews v. Railroad, 142 Mo. 660; Boyd v. United States, 116 U. S. 616; Counselman v. Hitchcock, 142 U. S. 547; Railroad v. Ellis, 155 U. S. 150; Hovey v. Elliott, 167 U. S. 409-19; State ex rel. v. Union Trust Co. (like motion denied, Missouri Supreme Court, October term, 1897); Ex parte Arnot Carter, 166 Mo. 604.

"To the rulings of the referee and to his conclusions of law in this regard the Attorney-General objected and excepted and still excepts.

"3. This information is based upon the act approved March 24, 1897 (Laws 1897, p. 208), whereunder it is sought to establish an illegal combination, pool, trust or conspiracy on respondents under the provisions thereof.

"Section 1 of the Act of 1897, after defining what shall constitute an illegal combination and what shall be a violation of law, contains the following exception:

" '*Provided, however, that the provisions of this section shall not apply to agreements of fire insurance companies, or their agents, or boards of fire underwriters, to regulate the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm in cities in this State which now have or which may hereafter acquire a population of one hundred thousand inhabitants or more.*'

"Whatever vice, if any, be attributed to section 1 of the Act of 1897 by reason of the exception noted, has been removed by the enactment of a new section in 1899 in lieu thereof, which not only omits the proviso of 1897, but specifically declares its application without reservation of any kind whatever. This statute has been considered by the honorable Supreme Court of Missouri in the following cases: State ex inf. v. Aetna Ins. Co., 150 Mo. 113; State ex inf. v. Firemen's Fund Ins. Co., 152 Mo. 1; State ex rel. v. Ass. Press, 159 Mo. 410. In

the first-mentioned case, the validity of the exception or proviso as to insurance companies was upheld.

"Since the determination of these cases by the Supreme Court of this State, the question arising here has been before the Supreme Court of the United States, in a recent case arising under the anti-trust laws of Illinois, which contain exceptions similar to those contained in the Missouri statutes, upon which this suit is bottomed, and that court held the Illinois statute void because of the exception. [Connolly v. Union Sewer Pipe Co., 184 U. S. 540.]

"Your referee is of the opinion, and so holds as a matter of law, that the grant of immunity to insurance companies in cities of one hundred thousand or more inhabitants, as contained in the proviso of section 1 of the Act of 1897, renders the whole act nugatory and violative of the Constitution of this State and of the United States. In consequence whereof this suit, being founded upon a void statute, can not be maintained.

"To this ruling and to these conclusions of law the Attorney-General excepted and still excepts.

"Your referee and special commissioner herewith submits the evidence heretofore taken, and has caused the same to be marked 'Exhibit A,' and 'Exhibit B,' together with the petition for the production of books, papers, witnesses, etc.; the order made thereon; the motion to set the same aside; the briefs and argument of counsel thereon, together with the original papers and exhibits in the case, and asks that this report be confirmed, and if confirmed, that your referee and commissioner have leave to file a supplemental report, or record of his proceedings herein, together with a statement of time occupied, and a detailed statement of costs and expenses for the purpose of taxing the same and of fixing a reasonable allowance for the services of your referee, etc."

On the 19th of April, 1902, the informant filed his

exceptions to the report of the commissioner, which are as follows:

"Now at this time comes Edward C. Crow, Attorney-General of the State of Missouri, who informs and prosecutes in this behalf on the part of said State of Missouri, and excepts to the action of the referee and special commissioner in his report to this honorable court for the following reasons, to-wit:

"*First.* This informant objects and excepts to the action of said referee and special commissioner upon the findings of fact and conclusions of law arising upon the pleadings, admissions of record, undisputed facts and evidence, because this informant has not yet completed the taking of testimony in said cause and has not as yet announced to said referee and special commissioner that he had completed the taking of said testimony and that there is yet much valuable testimony to be taken in relation thereto, and that due diligence has been exercised upon the part of this informant in the taking of testimony as is shown from the report filed by the commissioner herein.

"*Second.* This informant excepts to the action of the referee and special commissioner in setting aside, cancelling and annulling the order of February 25, 1901, requiring the production of books, papers, witnesses, etc. Said Act of May 4, 1899, upon authority of which said order was issued, is constitutional and valid, is not unreasonable, oppressive or void, and, therefore, said referee and special commissioner should have required said respondents to have produced the books, papers and witnesses asked of it by this informant.

"*Third.* The informant further excepts to the special report made by said referee and special commissioner, wherein it is stated that the information in this cause is based upon the act approved March 24th, 1897 (Laws 1897, p. 208), wherein it is sought to establish an illegal combination, pool, trust or conspiracy on

respondents, under the provisions thereof, and wherein said Act of 1897 is declared by said referee and special commissioner unconstitutional and void. And as a further exception to the report aforesaid, this informant says that this suit is not based upon a void statute, nor does its determination rest upon any statute law of the State of Missouri, but that it is alleged in informant's petition herein that the combination, monopoly, agreement, and conspiracy so formed as alleged therein, is in violation of and contrary to the general common law in force in the State of Missouri, so that it is not essential, so far as the merits of the case are concerned, whether the Act of March 24, 1897, be constitutional or unconstitutional.

"*Fourth.* This informant further excepts to the report of the referee and special commissioner herein in that the act of the J. G. Butler Tobacco Company, Brown Brothers Tobacco Company, Drummond Tobacco Company and Wright Brothers Tobacco Company, incorporations, in transferring the control of their property, franchises and properties of every character and description to the American Tobacco Company, and by it to the Continental Tobacco Company, is sufficient in and of itself to cause a forfeiture of their respective corporate charters, and that the act of the said American Tobacco Company and the Continental Tobacco Company, in assuming control over all the property and respective rights and privileges of the various co-respondents of the Continental Tobacco Company, and its purchase of practically all of the plug tobacco factories of the State of Missouri and of the United States, as this informant believes he will be able to prove if further testimony is permitted, is in and of itself sufficient to find said Continental Tobacco Company, together with all its co-respondents herein, engaged in an unlawful combination, conspiracy, pool, monopoly, to control the plug tobacco trade and traffic in the State of Missouri and elsewhere.

*"Fifth.* And that this informant will be able to show, as alleged in the petition, that it was a part of the plan of the officers, directors and shareholders of the various respondent corporations herein to. acquire and amalgamate all the property used in the manufacture and sale of plug chewing tobacco within the State of Missouri, with the view of establishing a monopoly in this business in said State.

"Wherefore, this informant moves to set aside the special finding of the referee and special commissioner on the questions of fact and conclusions of law contained in his report, and to set aside the ruling of said referee and special commissioner in refusing to require respondents to produce witnesses, books and papers demanded by the informant, and to set aside and overrule his finding of law upon the constitutionality of said act of the General Assembly of 1897 and against this informant in general, and that he be ordered and required to proceed with all reasonable speed with the further taking of such testimony as may be required of him by this informant or the respondents herein."

OPINION.

FOX, J.—It will be observed that this proceeding has been pending for more than four years, and the Attorney-General, with commendable energy and ability, sought to secure all the testimony pertinent to the issues in this proceeding.

A number of witnesses, who were supposed to know something of the methods of organization, as well as the manner of transacting business by the respondents, were introduced as witnesses and testified in this cause. This testimony has been preserved and accompanies the report of the commissioner.

We deem it unnecessary to recite in detail the evidence as taken before the commissioner; it will suffice to say, that it fails to show a combination or trust, created by respondents, as is sought to be prohibited by the

statute, unless the purchasing by the American Tobacco Company, of all the property, franchises, etc., etc., of the other corporations, and its transfer of all such property rights to the Continental Tobacco Company, in and of itself, constitutes sufficient proof of a combination and trust.

With the report of the commissioner, and the exceptions to such report before us, we deem it necessary, only, to dispose of two questions involved:

*First.* Were the findings and legal conclusions reached by the commissioner, as indicated in this part of the report, where he says: "The several purchases hereinbefore referred to, whereby the property of the other respondents became vested in the Continental Tobacco Company, having been for cash, your referee is of the opinion, and so holds as a matter of law, that such sales and purchases were not unlawful, and that a person may freely do with his own whatsoever he will, provided, he does not use it in derogation of common right and to the detriment of the general welfare," correct?

*Second.* Was there a sufficient showing on the part of the State, to require the commissioner, in the exercise of a proper discretion, to longer continue this proceeding; or does the record before us disclose such a state of facts, in view of the many years that this proceeding has been pending, to warrant this court in setting aside all the findings of the commissioner, and order and require him to further proceed with *the taking of testimony?*

In the discussion of these propositions, it is well to consult the statute in force at the time of the filing of this information, and ascertain the limitation upon the powers of corporations.

Section 1 of the Act of 1897, so far as applicable to this controversy, provides:

"Any corporation organized under the laws of this or any other State or country for transacting or con-

ducting any kind of business in this State, or which does transact or conduct any kind of business in this State, or any partnership or individual, or other association of persons whatsoever, who shall create, enter into, become a member of or a party to any pool, trust, agreement, combination, confederation or understanding with any other corporation, partnership, individual, or any other person or association of persons, to regulate or fix the price of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever, or the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, or to maintain said price when so regulated or fixed, or shall enter into, become a member of or a party to any pool, agreement, contract, combination or confederation to fix or limit the amount or quantity of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever, or the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, shall be deemed and adjudged guilty of a conspiracy to defraud, and be subject to penalties as provided in this act.''

Then follows the proviso, referred to by the commissioner, from which he deduces the legal conclusion that said act is unconstitutional. We will not discuss the constitutionality of this law; it is not necessarily involved in the determination of the questions presented by the record before us. Will say, however, that we do not concur with the legal conclusions of the commissioner, in respect to this statute, and it will suffice to say that this court has held otherwise. [State ex inf. v. Firemen's Fund Ins. Co., 152 Mo. 1.]

We quote this statute, simply that we may fully comprehend its import and appreciate the evils it is intended to suppress. It will be noted that the prohi-

bitions thereof are applicable to individuals and partnerships, as well as corporations. It prohibits any corporation from creating or entering into any pool, trust, agreement, combination, confederation or understanding *with any other corporation, partnership, individual or any other person,* or association of persons, to *regulate* or *fix prices* or to maintain such prices, when so regulated and fixed, or to fix or limit the amount or quantity of any article of manufacture. This statute contemplates the existence of at least two or more corporations, individuals or partnerships, so as to agree or combine with each other to do the prohibited acts mentioned in the statute. In other words, it is intended to operate upon two or more corporations or individuals, who, so far as the public are concerned, indicate that they are pursuing an independent business, legitimate competitors, when in fact there is a secret agreement by which the very things condemned by the statute are accomplished. The public has rights which the law contemplates shall be respected. Neither corporations, individuals, nor partnerships are permitted to deceive or mislead the public by an apparent competition, when in fact none exists.

On the other hand, the terms of this statute are not broad enough to prohibit one corporation, in good faith, in the legitimate pursuit of its business, from purchasing the assets of another corporation in a similar business. Its terms are applicable to individuals and partnerships, as well as corporations; its condemnation is as pronounced against the individual as it is against the corporation; hence it follows, if this statute is to be construed as prohibiting corporations from purchasing, in good faith, the assets of another corporation, it must be applied with equal force to the rights and powers of individuals.

It is conceded in this proceeding, that the Continental Tobacco Company was organized under the laws of New Jersey, and that in pursuance of the certificate

of the Secretary of State, it is authorized to do business in this State. The purposes of their organization are averred in the information; it is alleged: "That the Continental Tobacco Company is a corporation organized under and by virtue of the laws of the State of New Jersey; and that said J. G. Butler Tobacco Company, Brown Tobacco Company, Drummond Tobacco Company and Wright Brothers Tobacco Company, are corporations organized under and by virtue of the laws of the State of Missouri. The plaintiff states that all of said named respondents were so, severally, organized as corporations for the purpose of buying, manufacturing and selling tobacco; and were and are authorized to own, maintain and operate such plants, machinery, warehouses, etc., as may be necessary to the proper conduct of their several businesses." Thus we have clearly stated what the respondents were authorized to do under their respective charters.

The Continental Tobacco Company having been organized under the laws of New Jersey, being authorized to do business in this State, it necessarily brought with it the powers of its charter, unless restricted by the laws of this State.

In the case of Relfe v. Rundle, 103 U. S. 222, Mr. Chief Justice WAITE says: "No State need allow the corporations of other States to do business within its jurisdiction unless it chooses, with perhaps the exception of commercial corporations; but if it does, without limitation, express or implied, the corporation comes in as it has been created. Every corporation necessarily carries its charter wherever it goes, for that is the law of its existence. It may be restricted in the use of some of its powers while doing business away from its corporate home, but every person who deals with it everywhere is bound to take notice of the provisions which have been made in its charter for the management and control of its affairs both in life and after dissolution."

Vol 177 mo—3

The authority to buy, manufacture and sell tobacco, and the additional authority to own, maintain and operate such plants, machinery, warehouses, etc., as may be necessary to the proper conduct of its business, clearly granted the power to purchase any property, plants or machinery necessary to the proper conduct of their business.

We are not aware of any law, general or special, which restricts or limits a corporation, individual or partnership, as to the contractual powers, in respect to the subject involved in this proceeding.

It is true that the lawmaking power may restrict the freedom of contracts in some directions; but the power and authority exercised by the respondents in this cause, as reported by the commissioner, if done in good faith, seem not to have been restricted. When the authority is clearly granted to the corporation or individual to contract, the principle denouncing the infringement of such rights is equally applicable to both.

This court in the case of Railroad v. Railroad, 135 Mo. l. c. 199, in discussing the power of corporations to contract, speaking through GANTT, J., said: "What corporations may lawfully do is summed up in a few words by Judge THOMPSON in his recent commentaries on the Law of Corporations, volume 4, section 5645, where he says: 'In respect of the power of corporations to make contracts, two propositions may be stated: 1. That they have, by mere implication of law and without any affirmative expression to that effect in their charters or governing statutes, and of course in the absence of express prohibitions, the same power to make and take contracts, within the scope of the purposes of their creation, which natural persons have; 2. That this power, on the other hand, is restricted to the purposes for which the corporation has been created, and can not be lawfully exercised by it for other purposes.' This statement of the law accords with the general current of authority on this subject."

Judge BLACK, in the case of State v. Loomis, 115 Mo. 307, in the application of the principle of the right to contract, approvingly quotes from Story on the Constitution, where he very appropriately defines *liberty,* as used in the Constitution, and as applicable to freedom of contract. He says: "The word 'liberty' as used in these constitutional declarations means more than freedom of locomotion. It includes and comprehends among other things, freedom of speech, the right to self-defense against unlawful violence, and the right to freely buy and sell as others may." [2 Story on the Constitution (5 Ed.), sec. 1950.]

Continuing the discussion of the application of this principle, the learned and esteemed judge, in State v. Loomis, supra, says: "Liberty as we have seen, includes the right to contract as others may; and to take that right away from a class of persons following lawful pursuits is simply depriving such persons of a time-honored right which the Constitution undertakes to secure to every citizen."

Judge COOLEY in treating of this subject, says: "To forbid an individual or a class the right to the acquisition or enjoyment of property in such manner as should be permitted to the community at large, would be to deprive them of their liberty in particulars of primary importance to their 'pursuit of happiness;' and those who should claim a right to do so ought to be able to show a specific authority therefor, instead of calling upon others to show how and where the authority is negatived." [Cooley's Const. Lim. (6 Ed.), 484.]

Upon the power of corporations to transfer property, the rule is very clearly announced in 7 American and English Encyclopedia of Law (2 Ed.), p. 734. In the text we find the rule thus stated: "And by the weight of authority, both in England and the United States, a strictly private commercial corporation, owing no peculiar duties to the public, may, with the consent of all the shareholders, and in the absence of express or im-

plied restrictions in its charter, or prejudice to the rights of creditors, transfer all of its property to another corporation or person, if the latter is capable of taking."

The Supreme Court of Texas, in Gates v. Hooper, 39 S. W. 1079, very clearly interprets the meaning of the terms "trust and combination;" it says: "In order to constitute a trust, within the meaning of the statute, there must be a 'combination of capital, skill or acts by two or more.' 'Combination,' as here used, means union or association. If there be no union or association by two or more of their 'capital, skill or acts,' there can be no 'combination,' and hence no 'trust.' When we consider the purposes for which the 'combination' must be formed, to come within the statute, the essential meaning of the word 'combination,' and the fact that a punishment is prescribed for each day that the trust continues in existence, we are led to the conclusion that the union or association of 'capital, skill or acts' denounced is where the parties in the particular case designed the united co-operation of such agencies, which might have been otherwise independent and competing, for the accomplishment of one or more of such purposes. In the case stated in the petition there is no 'combination.' The plaintiff bought defendant's goods, together with the good-will of his business, both of which were subjects of purchase and sale; and, in order to render the sale of the good-will effectual, the seller agreed that he would not, for one year thereafter, do a like business in that town. This was but a kind of covenant or warranty that the purchaser should have the use and benefit of such good-will during that year; for it is clear that, if the seller had immediately engaged in a like business at the same place, the purchaser would have had no benefit therefrom. By this transaction neither the capital, skill nor acts of the parties were brought into any kind of union, association or co-operative action."

The Continental Tobacco Company simply exercised a legal right, to incorporate and conduct its business, if the purchase of the plants as owned by the American Tobacco Company was made in good faith, in the legitimate conduct and management of its business; then the conclusion reached by the commissioner in his report, that such transaction was not unlawful, was·correct.

That the respondent had the right to organize a corporation, we think is clear.

The laws of this State are broad enough to reach individuals who undertake to organize a corporation that would create a trust in itself; but where the corporation is alleged to be duly organized, then the condemnation of the statute as applicable to it, is not in the method of its organization; but by its express terms, it denounces and prohibits the unlawful acts, as a legal existing corporation.

It was a legitimate inquiry by the commissioner, as to the integrity and good faith of the transfer· by the American Tobacco Company of all its assets to the Continental Tobacco Company, and we have no hesitation in saying, considering the amount involved, the extent and far-reaching scope of the transaction, it was sufficient in itself to arouse in the mind of the Attorney-General a strong suspicion, yes, even a strong probability, that a trust was being created; and warranted his prompt action in the interest of the public, by filing the information herein.

However, it must be remembered that this proceeding partakes of the nature of a criminal prosecution, severe penalties are imposed, hence, it is not sufficient to warrant a finding adverse to respondents, that we may entertain strong suspicions, or even strong probabilities, of their guilt. Such conclusions should only be reached upon a clear showing by the testimony, fully satisfying the minds of the court that they were guilty

of the violations of the law as charged in the informa-
tion.

The case of Distilling Co. v. People, 156 Ill. 448,
is distinguished from this case by reason of the facts.
In that case there was a trust formed by a number of
unincorporated associations, and as was shown by the
testimony, to evade the condemnation of the statute.
This same trust of unincorporated associations, incor-
porated and conducted the business along the same lines,
and with a similar purpose. The court said: "That
corporation thus succeeds to the trust, and its opera-
tions are to be carried on in the same way, for the same
purposes, and by the same agencies, as before."

The commissioner, in the case before us, finds the
facts just the reverse of the Illinois Distilling case.
The commissioner, who is one of the circuit judges of
this State, has heard the testimony, had the witnesses
before him, and reports that from the evidence adduced,
there was nothing unlawful in the sale and purchase of
the assets of the corporations, as detailed in the re-
port. We will not disturb the finding of the commis-
sioner in that respect.

This brings us to the question as to the further con-
tinuance of this cause, for the reasons disclosed by the
record. Pending the hearing of testimony before the
commissioner, the State presented the following appli-
cation for the production of certain witnesses, books and
papers:

"Now comes Edward C. Crow, Attorney-General
of the State of Missouri, who prosecutes for the State
of Missouri in this behalf, and states and informs that
J. B. Duke of 111 Fifth street, New York City, is the
president of the Continental Tobacco Company, one of
the defendants herein, and that W. H. McAlister of 111
Fifth street, New York City, in the State of New York,
is secretary of the said defendant, the Continental To-
bacco Company. That the said J. B. Duke and W. H.
McAlister are non-residents of the State of Missouri

and are without the jurisdiction of the court in which said cause is pending, and that they are valuable and material witnesses for plaintiff in said cause and have in their possession certain books and documents which are material and necessary evidence on the part of this plaintiff. That among the books, papers and documents in the care, custody and possession of the said W. H. McAlister, secretary of the aforesaid Continental Tobacco Company, one of the defendants herein, is the stock book of said company containing a list of the stockholders and the number of shares held by each prior to and on the 1st day of February, 1899; the secretary's minute book containing an account of the actions and transactions of the board of directors and the stockholders of said company prior to and on the 1st day of February, 1899, together with the book, books, paper, papers, document and documents showing a list of the assets and holdings of the said Continental Tobacco Company and the value thereof, prior to and on the 1st day of February, 1899, and the date of acquiring the same; that said books, papers and documents are necessary and material evidence to the issues in said cause. That said Edward C. Crow, Attorney-General aforesaid, further states that he desires to take the evidence of said J. B. Duke and W. H. McAlister and to introduce in evidence the books, papers and documents aforesaid, at the court room of Division No. 2 of the Supreme Court of Missouri, in the Supreme Court building at the City of Jefferson, county of Cole and State of Missouri, on the 27th day of March, 1901, between the hours of nine o'clock in the forenoon and 5 o'clock in the afternoon of said day, and if not completed thereon to be continued from day to day until the same is for the time concluded. And for the purpose of taking said testimony and the introduction of said evidence the said Edward C. Crow desires the appearance and attendance of the said J. B. Duke and W. H. McAlister at the place and time aforesaid. Wherefore,

the said Edward C. Crow, Attorney-Genreal aforesaid, requests and prays the Hon. J. P. Butler, commissioner as aforesaid, to immediately issue a notice in writing directed to Messrs. Boyle, Priest & Lehmann, a law firm composed of Henry S. Priest, W. F. Boyle, and F. W. Lehmann, whose office is located in the Laclede Building at St. Louis, Missouri, and that a like notice immediately issue in writing directed to Hon. Martin L. Clardy, an attorney at law of St. Louis, Missouri, who, together with Messrs. Boyle, Priest & Lehmann, are the attorneys of record for the said defendant Continental Tobacco Company, a corporation organized and existing under the laws of the State of New Jersey, and a like notice directed to Fauntleroy & Howe, attorneys of record for the remaining respondents, notifying the said attorneys of record for said Continental Tobacco Company and the remaining respondents herein, that the testimony of the said J. B. Duke and W. H. McAlister is desired in said cause and require the said attorneys of record in said cause to have said J. B. Duke and W. H. McAlister, president and secretary, respectively, of the aforesaid defendant Continental Tobacco Company, at the place and on the day, date and time above set out, then and there to testify in said cause, and to require the said W. H. McAlister and J. B. Duke to produce in evidence the books, papers and documents above mentioned and described.''

This application is predicated upon section 8983, Revised Statutes 1899, which is as follows:

"Whenever any proceeding shall be commenced in any court of competent jurisdiction in this State by the Attorney-General against any corporation or corporations, individual or individuals or association of individuals, or joint stock associations or copartnership, under the law against the formation and maintenance of pools, trusts of any kind, monopolies in commodities, combinations or organizations in restraint of trade to dissolve the same or to restrain their formation

or maintenance in this State, then in such case, if the Attorney-General desires to take the testimony of any officer, director, agent or employee of any corporation or joint stock association proceeded against, or in case of a copartnership, any member of said partnership or any employee thereof, in any court in which said action may be pending or before any person duly authorized by any court to take testimony in any such action; and the individual or individuals, whose testimony is desired, are without the jurisdiction of the courts of this State, or reside without the State of Missouri, then, in such case, the Attorney-General shall file in said court in term time, or in vacation, or with any person duly authorized to take the testimony in such case, a statement in writing, setting forth the name or names of the persons or individuals whose testimony he desires to take and the time when, and the place in the State where he desires the said persons to appear; and, thereupon, the court in which, or one of the judges thereof, or the person before whom testimony is being taken, shall issue immediately a notice, in writing, directed to the attorney or attorneys of record in said cause, or any agent, officer or employee of any corporation, joint stock association or copartnership which are parties to said action, notifying said attorneys of record, or officer, agent or employee, that the testimony of the person or persons named in the application of the Attorney-General is desired, and requiring said attorney or attorneys of record, or said officer, agent or employee, to whom said notice is delivered or upon whom the same is served, to have said officer, agent, employee or representative of said copartnership or agent thereof whose evidence it is desired to take at the place named in the application of the Attorney-General and at the time fixed in said application, then and there to testify: Provided, however, that the said application shall always allow, in fixing said time, the same number of days for travel to reach the designated point in Missouri that

would be now allowed by law in case of taking depositions: Provided, also, in addition to the above named time, six days shall be allowed for the attorney or attorneys of record, or the agent, officer or employee on whom notice is served, to notify the person or persons whose testimony is to be taken. Service of said notice and the return thereon, in writing, may be made by any one authorized by law to serve a subpoena.''

There follow sections 8984 and 8985, which provide substantially that upon failure to appear and testify, as ordered, all defenses to such proceeding will be stricken out, and judgment by default rendered, upon the charges in the information.

The commissioner made the order as prayed for in the petition filed; but, subsequently, set it aside. The report of the commissioner assigns as his reason for setting aside the order, that the statute authorizing it is unreasonable, oppressive, void and unconstitutional.

We will not undertake to pass upon the constitutionality of this statute. It is not necessarily involved in this record. The witnesses were not compelled to appear, nor were any questions propounded to them which tended to incriminate them. The statute is a very strong one and far-reaching in its results; when witnesses are compelled to obey it then will be the appropriate time to determine its validity. Conceding for the purposes of this case, that this statute is constitutional, that it may not be subject to the criticism in the report of the commissioner, in which he says it ''is unreasonable and oppressive,'' the courts that are called upon to enforce it, must give it a reasonable interpretation. Under the statute, the application for the production of witnesses may be made to the court, or to the commissioner taking the testimony. We take it that the court before issuing its process, under the provisions of this strong and far-reaching statute, where it requires witnesses, without compensation, to come from the remotest parts of the Government, would,

at least, require a clear showing in the application, not only of the materiality of the testimony, but as well, the competency of the witnesses.

The statement that the president and secretary of this corporation can furnish valuable and material testimony, is not such a showing as would authorize either the commissioner or the court to put in motion the provisions of this statute. If by merely giving the names of the parties and the statement that their testimony is valuable and material, the court must issue the process, then the terms as applied to this statute that it is "unreasonable and oppressive" are quite appropriate. As to the application for the production of certain books and papers, will say that the commissioner followed the precedent in the case of State ex rel. Attorney-General v. Union Trust Co. and Mississippi Valley Trust Co., at the October term, 1897, of this court. While there was no opinion written denying the motion, yet a similar motion (except it was much more specific as to the materiality of the books and papers) was filed by the Attorney-General, praying the court to compel the trust companies to produce certain books, as evidence in the causes then pending against them. This court, by the following order, overruled this motion:

"Now at this day the court having fully considered and understood the motion heretofore filed for an order for the production and inspection of certain books and papers, doth order that said motion be, and the same is hereby denied."

It may be said that the motion filed in these cases was before the enactment of this statute, and not based upon it, but it must be remembered that the Union Trust and Mississippi Valley Trust companies were residents of this State, and if it had been deemed proper and appropriate to exercise the power, no statute was required. The only purpose of this statute was to provide a means of securing the witnesses contemplated by it, who were non-residents of the State.

With the record before us, the exception to the report of the commissioner in setting aside the order, issuing the process to the attorneys of respondents, and a refusal to issue, stands in the nature of an application for a continuance of this proceeding that other testimony may be taken.

Measured by the well-settled rules as to the essential requirements of applications of this character, it fails to make the clear showing indicating in what respects the testimony is material and relevant to the inquiry before the commissioner.

The Attorney-General has brought before the commissioner a number of witnesses, presumably supposed to know the entire nature of this transaction, and their testimony was taken and failed to disclose a violation of the provisions of the statute or of the common law in force in this State, in relation to combinations and trusts. We therefore see no reason why this proceeding should be further prolonged. The report of the commissioner, in respect to the finding of the facts and his legal conclusions upon that particular finding, will be confirmed, and the respondents discharged.

All concur.