ABRAHAM KRAMER ET AL., Appellants, *v.* FRANCIS McCAUGHEY ET AL., Respondents.

#### February 14, 1882.

1. Trusts in personal property are not within the statute of frauds, and may be established by parol; but the subject-matter and purposes of the trust, and the persons who are to take the beneficial interests, must be clearly ascertained.

2. Trusts in personal property cannot be established by loose, vague, and indefinite expressions or statements of the parties.

3. The fraudulent donee of an insolvent debtor will be treated as a trustee for the creditor of the fraudulent donor.

4. Where the fraudulent donee is a married woman, a judgment creditor of the fraudulent donor is entitled to a decree against the donee and her husband charging them with so much of the judgment as is not in excess of the amount fraudulently received.

5. Where such a decree cannot be enforced by ordinary process, the court should make such supplementary decretal orders as may be necessary to reach the fund.

6. An alleged trust in personal property which the assignor of the property was not bound to make, which rested on understanding only, and which was quite indefinite as to who were to be beneficiaries and in what proportions, will not, as against a creditor of the assignor, sustain the payment of a part of the fund to an alleged beneficiary.

APPEAL from the St. Louis Circuit Court, BOYLE, J. *Reversed and remanded.*

DAVID GOLDSMITH, for the appellants.

H. E. MILLS, for the respondents.

THOMPSON, J., delivered the opinion of the court. The record in this case shows that the plaintiffs, in March,

1879, recovered judgment for $847.48, against John and James McCaughey, on indebtedness contracted in 1876; that John and James McCaughey were brothers; that on October 26, 1878, John McCaughey procured insurance for $5,000 on his own life, payable to his legal representatives; that he never paid any premium thereon; that on November 11, 1878, he assigned the policy to his father, Francis, who agreed to pay the premiums thereon, and did thereafter pay the first quarterly premium, amounting to about twenty dollars; that Francis, on January 23, 1879, assigned the policy to James, who thereupon agreed to keep up the policy, and pay the premiums, and who did thereafter pay the second and third quarterly premiums, with the aid of the mother, who loaned him about five dollars to pay one of them; that these three quarterly premiums were the only ones paid on the policy; that John died in June, 1879; and that in September, 1879, while execution on the judg-, ment was in the sheriff's hands, James collected the insurance money, paid $4,500 thereof to his mother, Sarah McCaughey, and spent the remaining sum of $500 in such a manner that he cannot account for it.

The defence to the plaintiffs' petition is, that, at the times of the assignments of the policy from John to Francis, and from Francis to James, a tacit " understanding " prevailed among the members of the family, that the policy was to be kept up for the benefit of the family; that when John died, he directed or requested that of this insurance money $500 should be paid to his father, $500 to his mother, $1,000 to each of his two sisters, Mary and Sarah, and $2,000 to James, the mother to have the privilege of retaining for herself her two daughters' shares, and that the payment of the $4,500 to his mother was to cover the amounts payable to herself, her husband, her two daughters, and $1,500 which James owed her. It is, however, admitted that the assignments of the policy from John to Francis, and from Francis to James, were in writing, were simple, absolute,

and unconditional assignments, and contained no reference to said " understanding," and that, when they were respectively arranged for and made, no allusion was made by any of the parties to said " understanding," or to the manner of the distribution of the insurance money when payable, and all that was said at these times was, that the holder of the policy agreed to assign it, and the assignee agreed to keep it up and pay the premiums thereon.   It is likewise admitted, that the alleged understanding was simply that the policy should be for the benefit of the family; that until John's death it never assumed any more definite shape than this, and that " there was no understanding that the policy was for the benefit of the whole family, nor was there any understanding which members should get it, nor how it was to be divided, nor that any particular member should get any fixed share or amount ; " that, in point of fact, two brothers of John and James — to wit, Patrick and Owen — were ultimately left without any provision ; that John and James have been insolvent ever since 1876, and that at the date of trial their mother had not distributed any of said money paid her by James, but admitted that she still had $2,000 thereof locked up at home.

Three questions arise upon this record.   The first relates to the validity of the payment of the $3,000 of the insurance money by James McCaughey to his mother.   Was this a good payment upon a valid trust, or was it voluntary as against the existing creditors of himself and his deceased brother John?   The second relates to the validity of the payment of the $1,500 of this insurance money, claimed to be a portion of James's share under the family distribution of it, by James to his mother, in satisfaction of an alleged debt, due and owing by him to her.   The third is an inquiry as to what remedy, if the plaintiffs' view of the case on either of the preceding questions is adopted, can be given against Mrs. McCaughey, a married woman without any separate estate.

1. Upon the first question we are of opinion that the evidence is not sufficient to establish a trust in respect of the insurance money which James collected for the benefit of the other members of the family, such as is sought to be set up.    We concede the correctness of the proposition of the learned counsel for the defendants, that trusts in personal property are not within the statute of frauds, and may be established by parol.    Perry on Tr., sect. 86.    But while this is so, it is equally true, as in cases of parol trusts in real estate, where such trusts are possible, that " the subject-matter of the trust must be clearly ascertained, as well as the purpose of the trust, and the persons who are to take the beneficial interests.    Loose, vague, and indefinite expressions are insufficient to create the trust.    If the trust is once created in writing, it cannot be varied by parol, and if it is once created by parol, it cannot be altered or varied by other declarations of the trustee."    *Ibid.*    The evidence by which it is attempted to set up a trust here, does not answer the foregoing conditions.    In the first place, the policy of insurance was conveyed by John McCaughey to Francis, and by Francis to James, by an absolute written assignment, which created no trust, but vested the title to the policy in James without any limitations or restrictions whatever.    It is true that this would not, on the principle stated, preclude parol evidence that the assignment was, in fact, made upon a trust ; but, as the effect of such evidence would be to vary the terms of the writing, it would furnish an additional reason for requiring it to be clear and specific.    It is not clear and specific.    It is not of such a character that the trust could have been enforced in a court of equity, if James had refused, after receiving the proceeds of the policy, to recognize it.    The beneficiaries in the trust were not specifically named, nor was there anything to show how much of the trust-fund each one was to receive.

This very clearly appears from the testimony of James McCaughey himself, who must certainly be supposed to have

had as good a knowledge of the terms of this alleged trust as anyone else.   He says:  " I remember the transfer of the policy by my father to me.   Father was going to the country, and asked me to take the policy, and said he would assign it to me.   That was about the substance of the conversation.   I considered myself the owner of the policy in trust.   He wanted me to keep it up.   Previous to the assignment father said the policy belonged to the family.   This was while he held it.   I don't remember that any reference was made thereto at the time of the assignment to me, nor do I remember that anything was ever at that time said about the manner of the distribution.   Nothing was ever said about the distribution, except that there was a general understanding that the proceeds of the policy would go to members of the family.   There was no understanding as to which members should get it, nor was there any understanding that any member should get any particular portion of it.   No allusion was made to this understanding at the time of the transfer of the policy by my father to me.   The assignment of the policy by John to my father, was an absolute and unconditional assignment, and so was the assignment by my father to me.   Neither contained any reference or allusion to said understanding, or to any trust.   The one purported to assign the policy absolutely and unconditionally to my father, the other purported to assign the policy absolutely and unconditionally to me.   Both were in writing."

The testimony of the father, Francis McCaughey, does not make the matter any more clear.   He says:  " My son John said he thought he would not be able to pay up the policy, and he said he thought I had better keep it up, and have the same in my name, and that some day it would be useful to the family.   Nothing was said as to what would be done in case I survived him.   He agreed to assign the policy to me, if I would pay the premiums.   I agreed to pay the premiums, and did pay the first quarterly premium.   Noth-

ing was said by John as to how the proceeds should be distributed. Before the next premium came due, my son in Illinois (either said Patrick or said Owen), wrote to me to come there on some business. I had to go, and said to my son James, that I thought it would be better for the policy to be in his name — that I couldn't attend to it. I told James for to get it changed into his name, and to keep it paid up, and he agreed to do it. I agreed to transfer the policy to him, and that he was to pay the premiums. That was the whole agreement. There was nothing said about the distribution of the proceeds of the policy at this time. Nothing was ever said by John about such distribution except that the policy was to be for the benefit of the family. I considered myself the owner, but considered myself bound to distribute the money to the family. I thought the family needed it. Nothing more was said to James than I have stated. James understood what the policy was for, — that it was made for the benefit of the family, — but no reference was made thereto when the agreement was made for the transfer of the policy by me to him. I told James that I was an old man, and that it would not be much use to me, but would to the family. There was no understanding except what I have stated. I knew that if I asked him to give it to me when I came back that he would give it to me. I gave it to him freely, and he would give it back to me freely. For the time being, he was owner of it. He was not obligated to give it back to me. I was not obligated to give it to him."

These are certainly " loose, vague, and indefinite expressions," and hence insufficient to create a trust. They might well be characterized in the language employed by Lord Cranworth, in discussing the evidence which was offered to set up a trust in favor of a debtor's family, and against his creditors, in a case somewhat like this. " The settlement," said he, " was not one which Mr. Russell was in any way bound to make. It was said to have been made

in pursuance of a previous parol agreement. This allegation is very loosely made. It seems always to have rested on understanding only. It was not obligatory, which circumstance of itself would be sufficient to bring the case within the statute of Elizabeth." *Goldsmith* v. *Russell*, 5 De G. M. & G. 554. We may equally say here, that this distribution was one which James McCaughey was not in any way bound to make. It seems also to have rested on *understanding* only. It was not obligatory. It could not have been enforced in equity, and it was hence voluntary — a mere gift — and not good as against his then existing creditors, of which this plaintiff was one.

Our judgment on this branch of the case, then, is, that the assignments of the policy from John to Francis, and from Francis to James, were absolute out-and-out assignments, and not upon any trust in favor of the members of the family, such as can be recognized as against a creditor of John and James ; that by virtue of this assignment, James was, at the time of the death of John, the legal and equitable owner of the policy, free from any trust ; that the $5,000 which he received from the insurance company on account of it was his money, subject to the demands of his creditors, and which he was bound, in good conscience, to apply towards the payment of his debts ; that Mrs. McCaughey took from him $3,000 of this money as a mere volunteer, and is bound to hand over so much of it as is necessary to satisfy the plaintiff's judgment.

2. Our conclusion upon the foregoing proposition renders it unnecessary for us to decide the second question, whether or not the payment of $1,500 of this money by James to his mother, was a payment of a valid and subsisting debt, due by him to her. As this question is wholly involved in the credibility of the testimony of James and Mrs. McCaughey, and as it is not at all necessary to the rights of the plaintiff that we should decide it, we prefer to say nothing about it.

3. The most difficult question has been, what remedy we could afford the plaintiff under the peculiar facts of this case; and it was this question which we handed down for reargument. What remedy can a creditor enforce against a married woman, who has no separate estate, and who has become the fraudulent donee of money which he is entitled to have applied to the payment of his judgment? We take it that the disabilities with which the common law clothes married women, were intended to be used as a shield to pro-tect them, and not as a sword with which they might strike down the rights of others. We know that courts have gone very far in clothing married women with immunity against the consequences of their frauds. We have had occasion to investigate the subject at length, in connection with a late case. *Danner* v. *Berthold, ante,* p. 351. We do not think that the immunities of coverture extend so far that an insolvent debtor may hide away his money by giving it to a married woman to hold upon a secret trust for his use. We believe that where a married woman undertakes to act this part, a court of equity has the same power to declare her a trustee for a creditor of the fraudulent donor, and to com-pel her to respond as such trustee, as in other cases. In such cases, the possession of the wife is, in theory of the law, also the possession of her husband, and any judgment rendered against the wife should also, it seems, be rendered against the husband, at least for conformity. Whether, in case of the refusal of the wife to pay into court, or into the hands of a receiver, any money belonging to the donor which may be shown to be in her hands, the husband will be answerable with her for a contempt of court, or what proceedings can, in such a case, be taken against the hus-band and wife, or against the wife alone, we do not under-take to decide now. Such a decision would be premature, as the question is not yet before us, and any opinion which we might now express might embarrass the action of the circuit court. We are clear, however, that the plaintiff is

entitled to a judgment or degree against Francis McCaughey and wife, charging them as trustees with the amount of the plaintiff's judgment, with interest and costs, the whole not to exceed $3,500, to be enforced by ordinary process, and if this should prove insufficient, by such supplementary decretal orders as to the circuit court it may seem right and proper to make.

The judgment is reversed and the cause remanded with directions to enter such a judgment.    Judge BAKEWELL concurs ; Judge LEWIS is absent.'