Carroll v. Woods.

---

EDWARD CARROLL, Trustee, Respondent, v. W. S. WOODS et al., Appellants.

Kansas City Court of Appeals, May 25, 1908.

1. **TRUSTS AND TRUSTEES: Frauds and Perjuries: Personal Property: Evidence.** A trust in personal property may be created by parol and proved by oral testimony, provided it is certain as to its subject-matter, parties and purposes. *Held*, on the evidence of the record a trust in personalty is clearly established and that certain money came into the hands of defendants impressed with a trust declared by its owners of which declaration the defendants had knowledge and in which they participated.

2. **TRIAL PRACTICE: Misjoinder: Answer: Waiver.** Defendants separately demurred on the ground of misjoinder which demurrers were overruled. They then answered without pleading misjoinder. *Held*, the misjoinder was clearly waived.

Appeal from Jackson Circuit Court.—*Hon. Henry L. McCune*, Judge.

AFFIRMED.

*Elijah Robinson* and *Harris Robinson* for appellants.

(1) Mr. Carroll, the respondent, cannot maintain this suit, regardless of what conversation took place in regard to the $4,000 at the meeting held on the 30th of November, 1900. State ex rel. v. Hawes, 177 Mo. 380; Rector v. Albers, 174 Mo. 331. (2) Even if a trust of this kind could be established by parol, the evidence to establish it should be so clear, strong and unequivocal as to leave no room for a reasonable doubt as to the facts relied on. Johnson v. Quarles, 46 Mo. 423; Forester v. Scoville, 51 Mo. 268; Ringo v. Richardson, 53 Mo. 385; Kennedy v. Kennedy, 57 Mo. 73; Gillespie v. Stone, 70 Mo. 505; Philpot v. Pennsylvania, 91 Mo. 38; Allen v. Logan, 96 Mo. 592; Burdette v. May, 100 Mo. 13; King v. Isley, 116 Mo. 155; Bradley v. Bradley, 119 Mo. 58; McFarland v. La Force, 119 Mo. 585; Reed v. Painter, 129 Mo. 674; Pitts v. Weakley, 155 Mo. 137. (3) The trial court unquestionably committed error in overruling the separate demurrers of the defendants to plaintiff's petition. There was a misjoinder of parties defendant, even if the petition alleged facts sufficient to constitute a cause of action against either of the defendants.

*C. H. Kohler* and *Fyke & Snyder* for respondent.

(1) Plaintiff can maintain the action. Bank v. Edwards, 84 Mo. App. 469; Cudahy v. Bank, 134 C. Co. 538. (2) The evidence fully upholds the judgment of the court below. (3) Whether or not the court erred in overruling defendant's demurrers to plaintiffs' petition is not before this court. Burnham & Co. v. Tillery, 85 Mo. App. 453; Jones v. Railway, 89 Mo. App. 653; Rutlidge v. Tarr, 95 Mo. App. 265; Jones v. C. F. S. & M. Co., 178 Mo. 528.

JOHNSON, J.—Plaintiff, claiming to be the trustee of an express trust, sues to recover a part of the trust fund which, he alleges, is in the possession of defendants and is being wrongfully detained by them. He had judgment in the court below and the case is here on the appeal of defendants.

The evidence introduced by plaintiff discloses the following state of facts: In 1899, C. E. Doyle, a cattle man doing an extensive business in western Kansas, obtained at various times a number of loans from the Globe Live Stock Commission Company, a brokerage concern at Kansas City. In each instance, he gave his negotiable promissory note to the commission company for the sum borrowed and secured its payment by a chattel mortgage on cattle therein described, which were located on his ranch near Englewood, Kansas. Seven such transactions occurred and the notes together aggregated over $67,000. They were sold and endorsed by the commission company before maturity to various banks, one of them (a note for $16,468) to the defendant bank of which defendant Woods was president. During the year Doyle made shipments of some of the mortgaged cattle to the market at Kansas City and the commission company attended to selling the cattle so shipped and making distribution of the proceeds. Finally, information was received by the officers of the company relative to the financial condition of Doyle which so alarmed them that they called a meeting of the holders of his paper to determine what would best be done to protect their securities. At this time, it was known, or made known to the creditors, that the commission company itself was in financial distress and would be unable to respond to its endorsements of cattle paper in the event of loss.

Pursuant to the call mentioned, a meeting of the holders of Doyle's notes was held in Kansas City on November 30, 1899. Two of the officers of that com-

pany were present, one of whom, Mr. McGee, figured importantly in subsequent events out of which this controversy arose. Defendant Woods was not present, and it is contended by defendants that they were not represented at the meeting by anyone authorized to act for them. All of the other interested banks were represented. A statement from Doyle was read and considered with other information respecting his affairs and from the facts thus gleaned, it was found that Doyle was insolvent and that he owned a large quantity of land in western Kansas, apparently of considerable value, and a great number of cattle, each one of which was covered by one or more of the chattel mortgages. Further, it appears, that, owing to the loose and indefinite descriptions in the mortgages and to the facts that Doyle had shipped and caused to be sold some of the cattle and had commingled the remainder, it would be impossible for the holder of any mortgage to identify his cattle. In this situation, the creditors received with favor the suggestion that they pool their interests and put into hotchpotch all of the real and personal property of their debtor connected with his cattle business and which he had expressed to the officers of the commission company a willingness to convey to a trustee to be selected by the bankers for that purpose. What took place at the meeting thus is stated by one of the bankers:

"Well, in the first place, we seemed to think that each man who was there and held a mortgage on his cattle and had his mortgage there with the description, that possibly we could trace each man's cattle and each man could act for himself; but we discovered by going into the Globe Live Stock Commission Company that it was impossible to do that; that Mr. Doyle had shipped in cattle of all brands and they would be sold and the proceeds placed to his credit, and when he wanted any money he would write and they would send him money. They did not pretend to send him just the returns of

the cattle shipped, but would send him $500 or $200 or whatever he might want, and then he would ship in some more cattle; and we found by looking up the account of sales that there would be some of the brand that I held and some that the Bank of Commerce held and some that Mr. Schneider held and some that Mr. Carroll held, and we could not figure it out. So after a good deal of talking, we just concluded we would put the whole business right together, and he was willing to turn over everything he had, and just put it in a common pile and divide whatever we got out of it *pro rata* amongst us. They reported to us at the Globe Live Stock Company that he had then a credit to him of cattle shipped in of four thousand and some dollars and cents that stood there and it was impossible to tell who that money belonged to, the way they had been shipped in. . . . Then we concluded that there was no use to try to separate it out. We could not separate the cattle or anything else, and we would put it in a common pile and all share in the common expenses, whatever it should be, and whatever was netted out of it, we would share equally. Mr. Arnold (a director in defendant bank) spoke up after we came to the agreement and says: 'I will represent the Bank of Commerce and also the Ohio banks; I know those people.' And we talked awhile and Mr. Carroll spoke up and says, 'Well, now, Dr. Woods is pretty foxy. He had better come down and represent himself.' So, Mr. Arnold says, 'I will just call him up over the telephone.' And he called him up and I suppose he called him,—he said he did,—and he answered that that would be all satisfactory, so Mr. Arnold reported. Of course, there didn't any of us hear what Dr. Woods said. Then it became necessary to know who would take charge of it and then we decided immediately, without any objection whatever, that we would have Mr. Carroll take charge of the whole business as trustee."

Other witnesses present at the meeting testified to the same facts and it is not disputed that Mr. Carroll was selected as trustee to take charge and control of the common fund and that he was to go to Englewood, procure deeds for the land and transfers of the personal property and attend to reducing the estate to cash and then to divide it pro rata among the beneficiaries of the trust. Further, it was decided to employ a lawyer to accompany and aid the trustee in his work at Englewood. All of the bankers present lived in other cities and accepted the suggestion of Mr. Arnold that a lawyer be employed who, he claimed, was recommended for the service by defendant Woods. Accordingly, this lawyer was called into the meeting, the situation and agreement of the parties communicated to him, and the fact disclosed that the commission company had on hand about $4,000 in cash which belonged to the trust fund. While the meeting was in progress, Arnold talked frequently to defendant Woods over the telephone informing him of what was being done, but it is denied by defendants that anything was said about the $4,000. That night, or the next day, Carroll, the trustee, and the lawyer started for Englewood.

The evidence shows that the bankers were not advised of the true condition of the affairs of their endorser, the commission company. It was stated at the meeting that though the concern could not discharge its liabilities from endorsements, it had on hand funds sufficient to pay what it was owing to its customers from the sales of their live stock, including the $4,000 it had from the proceeds of Doyle's cattle. In fact, the company lacked some $10,000 of having sufficient money to pay such obligations, and its officers realized that it devolved on them to make good the shortage. Accordingly, the next day after the bankers' meeting, McGee induced his mother, who was a person of means and

credit, to borrow $10,000 and lend it to the company. She secured the money from defendants on her promissory note and with the understanding that the amount of the indebtedness of the commission company on account of sales of Doyle's cattle was to be paid over immediately to defendants. McGee testified:

"Mother borrowed $10,000 from Dr. Woods (defendant) to loan to the Globe Live Stock Commission Company. Four thousand dollars of it was paid over to Dr. Woods through the Globe Live Stock Commission Company and credited on a note. And the statement was made at that time from Mr. Vorhees (one of the officers of the commission company), 'I understand that this is your money, Doctor, but I also understand that there is other notes out given by this man, and it might be somebody else's money, or some of it might be somebody else's money.' The doctor says, 'If anybody shows any better right to this money than I do, why it is in good hands.'"

Instead of placing at her disposal all of the proceeds of the loan made to Mrs. McGee, defendant bank, acting through its president, had her draw at once a check payable to the order of the commission company for the amount of the Doyle fund and had the proper officer of the company indorse the check to the bank. The amount then was credited by defendants on the note of Doyle held by them. In such manner, defendants sought to withdraw this money from the bankers' trust fund and to secure it for defendant bank.

We return now to the trustee and lawyer whom we left on the road to Englewood. While they were en route, it suddenly occurred to the lawyer that it would be well for him to telegraph Mr. Arnold to place the $4,000 in shape so that no outside creditor of Doyle could tie it up in an attachment proceeding. Some telegrams were exchanged, but they were not shown to the trustee, and the lawyer, when on the witness stand,

could not remember their contents. Trustee and law-- yer were at Englewood perhaps a week conferring with Doyle and his attorney and getting matters arranged for the execution of the necessary deeds and other pa-- pers. The trustee left for his home in Leavenworth before the work was completed and was surprised to learn, some time after, that defendant Woods had been made the grantee in all the papers executed by Doyle, at the request of the lawyer, and had assumed the func- tions of trustee without the knowledge or consent of the other bankers. The lawyer, afterward, claimed that the change was made at the direction of Arnold. In the conveyances executed by Doyle to Woods, no mention was made of the money in the hands of the commission company. When the bankers learned of the change in trustees and of the fact that defendant bank had ob- tained the $4,000 and was claiming it as its own, a vig- orous protest was made which finally culminated in the restoration of Carroll as trustee, but not in the delivery to him of the $4,000. A written contract was signed by the bankers and defendants which contained the fol- lowing reference to the money:

"Nothing herein contained shall in any way affect the rights of any of the creditors herein mentioned to the sum of $4,000 paid to the National Bank of Com- merce on the first day of December, 1899, and by said bank credited on its note against Doyle, endorsed by the Globe Live Stock Commission Company, the said National Bank of Commerce claiming that it is entitled to retain said sum of money as a payment on its said note and the other creditors herein mentioned claiming that the same should be divided among all the creditors herein mentioned in proportion to their respective claims."

In time, the trust property was converted into money and the proceeds were divided pro rata among the beneficiaries of the trust, including the defendant

bank.    The other bankers then assigned their respective interests in the $4,000 to plaintiff and this suit was brought for the recovery of that money as a part of the trust fund.    The note of $10,000 executed by Mrs. McGee to defendant bank was paid in full by her before the bringing of the suit.

Defendant Woods denied on the witness stand that defendants were represented at the meeting held on November 30th, that the lawyer was engaged for the trustee at the request of defendants or in their interest; that defendants knew of the fact that the $4,000 was to be turned into the trust fund or that the substitution of trustees was made at the instigation or on request of defendants.    But he admitted that Arnold had communicated with him by telephone while the meeting was in progress and "told me what had·been agreed and I told him it was satisfactory," and relative to the McGee loan, his testimony, in effect, was the same as that of witness McGee except that he denied having the conversation with Mr. Vorhees related by the latter witness.    No claim is made in the evidence of defendants that the sum of $4,000 owed by the commission company was the proceeds of the sale of cattle covered by the chattel mortgage held by defendant bank; nor does any fact appear from which it might be said that the money should have been paid to defendants and not included in the trust fund.

Defendants separately demurred to the petition on the ground of a misjoinder of parties defendant.    The demurrers were overruled and defendants answered to the merits without pleading misjoinder as a defense. Defendants included the objection in the motions for a new trial and in arrest and now urge it on our consideration, but we shall dispose of it after the merits of the case have been discussed and determined.

It is argued that plaintiff "had no beneficial interest in the fund and if he could maintain suit at all, it

would only be as the trustee of an express trust, and it is well settled in this State that he cannot maintain a suit as trustee of an express trust unless such trust was created by writing." [Citing State ex rel. v. Hawes, 177 Mo. 1. c. 381; Rector v. Albers, 174 Mo. 331.] The cases cited relate to trusts of real property and the rule followed in them is predicated on section 3416, Revised Statutes 1899, which provides: "All declarations or creations of trust or confidence *of any lands, tenements or hereditaments* shall be manifested and proved by some writing signed by the party who is or shall be by law enabled to declare such trusts," etc. The subject matter of the trust before us is the fund that was in the hands of the commission company and being personalty, it was not affected by the rule invoked. A trust of personal property may be created by parol and its existence proved by oral testimony. Courts, however, do not permit such trusts to be established by evidence of a vague or uncertain character. The supporting testimony must be clear and explicit and leave no room for a reasonable doubt that a trust was intended. There must be certainty as to subject-matter, parties and purpose. [Pitts v. Weakley, 155 Mo. 1. c. 137; Mulock v. Mulock, 156 Mo. 1. c. 440; Curd v. Brown, 148 Mo. 1. c. 92; Kramer v. McCaughey, 11 Mo. App. 429.] In the case last cited, it was said: "But while this is so (that trusts in personal property may be established by parol), it is equally true, as in cases of parol trusts in real estate, where such trusts are possible, that the subject-matter of the trust must be clearly ascertained, as well as the purpose of the trust, and the persons who are to take the beneficial interest. Loose, vague and indefinite expressions are insufficient to create the trust."

Does the evidence under consideration by which the trust is endeavored to be proved measure up to the standard of the rule just stated? We answer the ques-

tion in the affirmative for the reasons now to be given. All of the testimony shows beyond question that the fund in dispute was the proceeds of cattle on which one or more of the bankers held a mortgage and that their common mortgagor had no beneficial interest in that money and no other concern about it than to see that it went to its rightful owner or owners.    None of the mortgagees could identify the money nor any part of it as his own, and it was conceded by all, including the mortgagor, that it did belong to some of the mortgagees.    It is clear that defendant bank had no superior claim to the fund under its mortgage nor any claim which it could sustain in court.    These facts most potently sustain the testimony of plaintiff's witnesses that in order to solve the difficulty, all of the parties, among whom were the real but unknown owners, agreed to throw the fund into hotchpotch and place it in the hands of a trustee for equitable division. It would be beyond reason to think that any of the other bankers would consent to defendant bank being given a preference when it enjoyed no advantage in position over any of the other mortgagees.    Common knowledge of the ways of bankers leads us to say they do not readily surrender pecuniary claims except under stress of adverse facts of a compelling character.

By what right do defendants claim the money? Doyle did not give it to them, nor would it have amounted to anything if he had, since he had no real interest in it and, therefore, had nothing to give.    The officers of the commission company gave it to defendants out of the proceeds of a loan they procured from Mrs. McGee, but the fact that they were compelled to borrow money to make good a shortage of funds they should have had on hand to discharge their own obligations as trustees of the company's customers gave them no right to divert such funds.    They had no interest in the money in question and no right to dispose of it, except to pay

it out on the order of its rightful owners, the mortga-
gees. They were advised by such owners at the meet-
ing to deliver it to their trustee and their attempt to
aid defendants to convert the money to their own use
was wholly unjustifiable and wrongful. The evidence
is clear and convincing that a trust was created and
it is equally convincing that defendants were parties
to its creation. It overtaxes credulity to believe that
they were not represented at the creditors' meeting, were
not fully advised of what was done and did not consent
to the creation of the trust. They were well repre-
sented both by Arnold and the lawyer, as subsequent
events we have recited abundantly demonstrate. The
money came into the hands of defendants impressed
with a trust declared by its owners (the mortgagees)
at their meeting, and, in applying it on their demand
against Doyle, defendants unlawfully converted it to
their own use. They must restore it to the trustee.

Defendants are in no position to raise the ques-
tion of a misjoinder since they waived the objection
by answering to the merits without pleading a mis-
joinder. [Burnham v. Tillery, 85 Mo. App. 453; Jones
v. Railroad, 89 Mo. App. 653; Rutledge v. Tarr, 95 Mo.
App. 265; Jones v. Railroad, 178 Mo. 528.]

The judgment is affirmed. All concur.