CHARLES P. SHIPLEY et al., Respondents, v. METROPOLITAN STREET RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, May 2, 1910.

1. **NEGLIGENCE: Humanitarian Doctrine: Sufficiency of Evidence.** Up to the night of the accident in question defendant had operated a double track cable car system on the street where the accident occurred. That evening it began the operation of an electric car on the line. This car ran back and forth on one track. At the time of the accident plaintiff's minor son was walking east on the track on which cars had theretofore run westward. According to plaintiffs' evidence a car from the west came up behind him without slacking speed or sounding a warning and ran over him, causing his instant death. Had the motorman been looking ahead he could have seen the pedestrian and stopped his car or given a warning and thereby have prevented the catastrophe. Under the facts in this case the trial court was justified in submitting the case to the jury.

2. ———: ———: **Witnesses: Inconsistent Statements.** Discrepancies in the testimony of a witness as given on different occasions do not necessarily nullify the effect of the evidence of such witness, but make the credibility of his evidence a matter for the determination of the jury.

3. **PRACTICE: Sufficiency of Evidence.** In passing on a demurrer to the evidence every reasonable inference must be drawn in favor of the cause of action asserted.

4. **NEGLIGENCE: Care Proportionate to Danger.** Under the facts in this case the motorman was negligent in running his car at a speed that prevented his stopping it in less than 100 feet when his headlight would not enable him to see more than 30 or 40 feet, and in failing to give frequent warning of the movement of his car.

5. **CONTRIBUTORY NEGLIGENCE: Sufficiency of Evidence.** Under the facts in this case the question of whether or not deceased was negligent was for the jury.

6. **HUMANITARIAN DOCTRINE: Sufficiency of Evidence.** Even though deceased had been negligent, plaintiff made a case for the jury under the humanitarian doctrine.

7. **NEGLIGENCE: Humanitarian Doctrine: Conflicting Theories.** There is no error in submitting a case to the jury on proper instructions on two different theories of negligence; first, that the peril of decedent was created by the sole negligence of defendant, and that decedent was not negligent; second, that the decedent may have been negligent, but that defendant by the exercise of due care could have avoided injuring him notwithstanding his negligence.

8. ———: ———: ———. The humanitarian doctrine does not necessarily presuppose that the injured person is negligent. It does not take into account the question of how the peril was created, but takes the imperiled man where it finds him, regardless of whose fault placed him there, and if by the exercise of due care by defendant he could have been saved and is not, defendant is liable.

Appeal from Jackson Circuit Court.—*Hon. James H. Slover,* Judge.

AFFIRMED.

John H. Lucas and R. T. Railey & Son for appellant.

(1), Deceased was guilty of absolute recklessness, in coming upon or walking along the track, at the time and place of accident, and the plaintiffs, by reason thereof, are not entitled to maintain this action. The demurrer to the evidence should therefore be sustained. Laun v. Railroad, 216 Mo. 580; McGee v. Railroad, 214 Mo. 546; Holland v. Railroad, 210 Mo. 351; Sissel v.

Railroad, 214 Mo. 515; Brockschmidt v. Railroad, 205 Mo. 435; Cahill v. Railroad, 205 Mo. 407; Mockowik v. Railroad, 196 Mo. 568; McGrath v. Railroad, 197 Mo. 97; Boring v. Railroad, 194 Mo. 548; Clancy v. Railroad, 192 Mo. 615; Green v. Railroad, 192 Mo. 131; Deane v. Railroad, 192 Mo. 587; Schmidt v. Railroad, 191 Mo. 215; Engleking v. Railroad, 187 Mo. 164; Giardina v. Railroad, 185 Mo. 330; Reno v. Railroad, 180 Mo. 469; Ries v. Railroad, 179 Mo. 7; Petty v. Railroad, 179 Mo. 67; Evans v. Railroad, 178 Mo. 516; Koons v. Railroad, 178 Mo. 591; Moore v. Railroad, 176 Mo. 545; Zumalt v. Railroad, 175 Mo. 311; Sharp v. Railroad, 161 Mo. 214; Tanner v. Railroad, 161 Mo. 497; Davies v. Railway, 159 Mo. 6; Holwerson v. Railroad, 157 Mo. 223; Peterson v. Railroad, 156 Mo. 555; Coatney v. Railroad, 151 Mo. 48; Culbertson v. Railroad, 140 Mo. 64; Vogg v. Railroad, 138 Mo. 180; Sinclair v. Railroad, 133 Mo. 245; Watson v. Railroad, 133 Mo. 246; Loring v. Railroad, 128 Mo. 360; Maxey v. Railroad, 113 Mo. 1; Ring v. Railroad, 112 Mo. 229; Boyd v. Railroad, 105 Mo. 371; Barker v. Railroad, 98 Mo. 53; Powell v. Railroad, 76 Mo. 80; Purl v. Railroad, 72 Mo. 168; Harlan v. Railroad, 64 Mo. 480; Hawkins v. Railroad, 135 Mo. App. 524; Ross v. Railroad, 135 Mo. App. 614; Bennet v. Railroad, 122 Mo. App. 703.   (2)   The court erred in submitting the case under the humanitarian doctrine and under another theory of negligence, at the same time.   Hof v. Transit Co., 213 Mo. 467; Krehmeyer v. Transit Co., 220 Mo. 639.   (3)   Each instruction must be correct in itself as far as it goes; they must all be consistent with each other; and the whole taken together must present but one doctrine or the jury will have nothing to guide them.   Thomas v. Babb, 45 Mo. 388; Goetz v. Railroad, 50 Mo. 474; Stevenson v. Hancock, 72 Mo. 612; Price v. Railroad, 77 Mo. 512; Spillane v. Railroad, 111 Mo. 564; Payne v. Railroad, 129 Mo. 418; McMahon v. Express Co., 132 Mo. 649.

*Beardsley, Gregory & Kirshner* for respondents.

(1)   Decedent was not negligent as a matter of law.   It was not his duty to at all times keep a continuous watch for an approaching car at the peril of life and limb; he had the right to assume that those in charge of cars would, so far as they could by the exercise of ordinary care, refrain from injuring him. Rapp v. Transit Co., 190 Mo. 145; Mayes v. Metropolitan, 121 Mo. App. 614.   (2)   Defendant was negligent in running a car on the wrong track, on a dark night, with a slippery rail, in a mist, at eight or ten miles an hour, in a residence neighborhood, where because of the trees, people were wont to walk on dark nights in the street.   These facts, which were all in evidence, warranted the submission of the matter to the jury.   Thompson on Neg. (2 Ed.), sec. 1873-7; Haley v. Railroad, 197 Mo. 15; White v. Railroad, 202 Mo. 539.

JOHNSON, J.—This action is prosecuted jointly by the father and mother of Frank P. Shipley, deceased, to recover five thousand dollars under section 2864, Revised Statutes 1899, for the killing of their minor son by a street car operated by defendant on the Ninth street line of its street railway system in Kansas City. The petition is in three counts and negligence of the defendant in the operation of the car is the cause of action pleaded in each.   The answer contains a general denial and a plea of contributory negligence.   A trial resulted in a verdict and judgment for plaintiffs for the amount sued for, and the cause is here on the appeal of defendant.

Frank Shipley was killed about 12:15 in the morning of May 23, 1903.   He was sixteen years old, unmarried and was living with his parents (plaintiffs) at 3307 east Ninth street in Kansas City.   This street runs east and west, is a public thoroughfare, and, at the time of the tragedy, was paved with asphalt and was

provided with sidewalks. Defendant was operating a double track cable railroad laid along the middle of the pavement. Westbound cars were run on the north track and eastbound cars on the south track. This had been the custom for years. Defendant had begun the conversion of the line into an electric railroad and at six o'clock in the evening of May 22, began running electric cars on the north track. An eastbound electric car on that track ran over young Shipley at a point in the street less than a block from his home and killed him instantly. The car, of the type known as single truck, carried a sixteen candle power headlight with a reflector behind it and was equipped with hand brakes only. The facts that the young man was walking in the street and was on the north track when the car struck him are not in dispute, but the point in the street where he was struck and the direction of his course are matters of controversy. It is the contention of plaintiffs that in returning home he was walking east on the north track, that he chose that part of the street in preference to the sidewalk on account of the lateness of the hour and the intense darkness cast over the sidewalks by shade trees along the curbs, and, unaware that a car was coming from the wrong direction was struck down without warning. This theory is combated by evidence of defendant which tends strongly to show that defendant was not guilty of negligence, but that the young man lost his life by his own negligence. Defendant argues with great earnestness that the evidence of plaintiff, when properly sifted and weighed, does not support the inference that negligence of defendant operated either to place the decedent in peril or to prevent his escape after the motorman knew or, had he been in the exercise of reasonable care, should have known that the decedent was in peril. The questions raised in this argument will be the first to receive our attention.

Below is a plat of the locality in controversy:

Shipley v. Railway.

Benton boulevard runs north and south and intersects Ninth street. The next north and south street to the east is Indiana avenue. There is a jog in this thoroughfare at Ninth street. Running south from Ninth street, Indiana avenue is 350 feet east of Benton boulevard and is but fifteen feet wide. Running north from Ninth street, the avenue is 560 feet east of Benton boulevard and is sixty feet wide. There were two street lamps burning that night, one on the south side of Ninth street about 170 feet east of the boulevard and the other on the north side of Ninth street about 340 feet east of the boulevard. Coming east on Ninth street, there is a slight upward grade to the boulevard, thence east the grade is downward, but so slight that it is not apparent to the eye. On account of the wide divergence between the parties in their understanding of the evidence, we find it necessary to refer somewhat extensively to the testimony of the witnesses.

Mr. Jones, a witness introduced by plaintiffs, testified that he lived on the south side of Ninth street, a short distance east of the place of the accident, that he was in bed asleep and was awakened by shouting; that he arose, put on some clothing and went into the street; that he saw the body of young Shipley, which was badly mangled from the chest down, lying on the north side of the street and that the car was standing some distance east of the body. Witness does not remember whether the body was lying on the north track or the north side of it, but states the body was lying near the lamp on the north side of the street, which would place it about three hundred and forty feet east of Benton boulevard.

Mr. Cowden, also introduced by plaintiffs, testified that he was the conductor of the car; that the car was on single trucks, was thirty or thirty-two feet long and carried a headlight consisting of a single bulb in front of a reflector. That it was running eight or ten miles per hour and did not begin to slacken speed until it struck

young Shipley and that the night was dark and cloudy. On cross-examination, he said the car stopped somewhere between north and south Indiana avenue, and that it was forty or fifty feet in front of the body which was lying north of the north track, but with one leg or foot on the track. On re-direct examination, he said the car was stopped in forty or fifty feet. At the time of the collision, witness was in the rear vestibule. While he does not give the exact location of the body with respect to landmarks, his testimony accords with that of the witness Jones.

A Mr. Hill, an ex-motorman of defendant company, was an expert witness for plaintiffs and testified that under the weather conditions disclosed by the evidence, the car could have been stopped in from thirty-five to forty feet and that a headlight similar to that carried on the car would throw light ahead on the track a distance of from sixty to seventy-five feet. The credibility of this witness was vigorously assailed in the cross-examination, but we think his credibility was not removed from the field of debatable facts and that in the consideration of the demurrer to the evidence, we must accept him as a credible witness, since we cannot pronounce him foresworn either on account of his interest in the case or as giving testimony at war with physical law and fact.

Another Mr. Jones, introduced as a witness by plaintiffs, lived on the south side of Ninth street and was awakened by the shouting. He stated that when he reached the street, he saw the body lying near the west line (prolonged) of south Indiana avenue. He walked west on the track and found a lead pencil about 100 feet west of the body and about ten feet east of some stone steps leading to the Bolen property which were shown by measurement to be 125 feet west of the west line of south Indiana avenue. By this testimony, the body was located near the street lamp on the north side of Ninth street. Further, witness stated

that he found the boy's hat forty-five or fifty feet west of the body and an umbrella somewhere west of the lamp-post.

The next witness offered by plaintiffs was Ira Brodie, a civil engineer, who lived at 3461 East Sixth street, a place north and east of the scene of the injury. He was the only eye-witness of the death introduced by plaintiffs and his credibility is severely attacked by counsel for defendant who asks us to disregard his evidence on the ground that it so abounds in contradictions and evident misstatements as to be wholly valueless. Witness was returning home from the theater. He had come out on the Twelfth street line to Indiana avenue and walked north to Ninth street. He said "The first I noticed when I got to Ninth street was an electric car at Benton boulevard. I was attracted by the noise—it had been a cable system up to that time and the noise was something unusual—so I stopped and watched it coming down the hill, taking my time walking out to the car track and between me and the car I saw a man walking on the track . . . on the north track . . . he was going east . . . he was even with the west retaining wall in front of Bolen's residence . . . the car was on the north track. I never saw it on that track before going in that direction . . . the car overtook him, hit him and knocked him quite a ways ahead of it and overtook him again."

"Q. Where did the car overtake him in reference to any landmark on the street? A. About even with Bolen's front steps (87 feet east of Bolen's west line). Q. State if the young man left the track from the time you observed him first at the west end of Bolen's wall to the time he was struck. A. No, sir. . . . After the car had finally got over the body—it had dragged it until that time—it got over and kept on going . . . as it passed me I yelled 'You have killed a man.' I yelled it three times—it ran down to north

Indiana avenue and stopped." Going back over this testimony which was given on direct examination it will be observed that when the witness first saw the young man the latter was about 170 feet east of the car, was walking eastward on the north track and walked about eighty-five feet when he was overtaken by the car which had run about 250 feet. Witness, when he came into Ninth street was 350 feet from the car and about 180 feet from the boy. On cross-examination, witness was confronted with a stenographic report of his testimony given at the coroner's inquest on the day of the killing and also by his testimony given at a former trial of the cause. The report of the inquest quoted the witness as saying that he was sixty or eighty feet from the boy when he first saw him and that the car then was only about fifteen feet behind the boy. The cross-examination is very long and severe. To give its import in detail would require quotations so voluminous that this opinion would be unduly lengthened. We shall content ourselves with saying that defendant forced the witness to admit that the distances and measurements given in his testimony at the inquest were radically different from those appearing in his last testimony, but we do not think we should hold, as a matter of law, that the witness was guilty of perjury. The discrepancies may be explained as being due to the natural proneness of the mind, more pronounced in some persons than others, to err widely in estimates of time and space. The witness testified at the inquest without an opportunity to go over the ground and make measurements. He had fixed the respective positions of himself, the car and the body by landmarks, and observations made afterward disclosed that his estimates of distances formed by what he had seen at night under exciting conditions were wide of the actual facts. We think this case does not call for the application of the rule stated by the Supreme Court in the following excerpt from the opinion in Oglesby v. Railway, 177 Mo. l. c. 296:

"Upon the testimony of a witness to antagonistic and irreconcilable statements of a fact, one tending to sustain the allegations of a petition, the other to disprove it, no one would contend for a moment that the case was one for the determination of a jury. Until a witness can determine for himself just what he saw or did not see, a jury is not warranted in making the determination for him. Under such circumstances the court should dispose of a case as if the witness had not spoken; as if plaintiff had offered no proof upon that averment of his petition."

The testimony of Brody at the last trial contains no "antagonistic and irreconcilable statements of fact" but is consistent and harmonious. It is out of harmony with his testimony on a former occasion, but that variance and his explanation of it are matters which pertain to his credibility *as an issue of fact* and do not warrant us in branding him a perjurer in law. In considering the demurrer to the evidence, we shall take his testimony at par. Summed up, it is to the effect that while the young man was walking eastward on the track in plain view of the motorman of a car coming from the wrong direction, he was run down and killed without any warning being sounded and without any effort of the motorman to stop the car or check its speed.

The motorman offered as a witness by defendant said the night was dark and cloudy, that it was misting, that the rails were "gummy and slippery;" that the car was running eight or nine miles per hour; that the headlight was burning; that he was at his post of duty standing between the wheel brake and the controller and looking ahead; that he rang the bell as the car approached south Indiana avenue. We quote from his direct examination as follows:

"Q. Were there any lights along that street anywhere, Mr. Eager? A. Yes, sir.

144 App—2

"Q. Where was it, or where were they? A. There was a gas lamp on the north side of the street, just before you got to south Indiana avenue—about ten feet west of south Indiana.

"Q. Was there any other? A. No, sir.

"Q. Now, did you see anybody in the street there before the accident occurred, and if so just tell the jury what you saw and where it was? A. Well, before I got to south Indiana—probably 100 feet away, I saw an object pass this light, on the eastbound track, or southbound track.

"Q. What light are you referring to? A. This gas light.

"Q. Now where was that object? A. It was on the south track.

"Q. Well, go ahead.

"Mr. Boyle: Where did you say it was? What did you say about 100 feet? A. When I was in about 100 feet of south Indiana, I seen an object cross south Indiana past this lamp.

"Q. Going by this light that was on the north side? A. Yes, sir.

"Q. And that object you saw on the south track? A. Yes, sir.

"Q. Did you see anything on your track in front of your car at all? A. No, sir, I did not.

"Q. What was the next thing that you saw, if anything? A. And the next thing, after I got by the lamp post, about forty or fifty feet, there was an object crossed in front of my car from the south.

"Q. How close to the front of your car? A. Well, it wasn't over ten feet away from me.

"Q. Just describe, just as near as you can, Mr. Eager, just what you saw and how quickly you saw it—just as near as you can, in your own way, as it appeared to you. A. I was standing there between my controller and my brake, and I had my right hand on the brake and left hand on the controller, and the glass in front

of me was misty, so I had my head up pretty close to the glass and looked right straight ahead, kind of leaning on the brake wheel—that way (indicating)—and the first thing I knew, this object crossed right from the south, in front of me.

"Q. Couldn't you see it close enough to tell what it was with any accuracy? A. No, sir.

"Q. You couldn't? A. No, sir.

"Q. Could you feel the car strike it or strike anything? A. Yes, sir.

"Q. Did you know when your car struck it what it was? A. No, sir.

"Q. How dark was it there at that time, Mr. Eager? A. Well, it was pretty dark—there was no light.

"Q. No light except the headlight? A. Except the headlight.

"Q. Was there any object coming up to your car, or that your car came up to, which your headlight threw any rays upon? A. No, sir.

"Q. This object you say came from the south? A. It came from the south.

"Q. What if anything did you do, Mr. Eager, as quick as you saw the object pass in front of your car and heard your car strike anything? A. Just as soon as I seen that object cross I jerked the reverse and pulled my controller handle clean around, to put my car in backward motion."

"Q. Now under these conditions, Mr. Eager, the conditions you have described to the jury, that existed there, being a dark, cloudy, misty, rainy, wet night—about how far, in your opinion, would this headlight disclose a man walking on the ground anywhere in front of your car—not on the rails, but on the ground there between the rails, or outside, in the range of the headlight—how far in front of your car would you probably see a man under these conditions, with the car in motion and approaching him? A. From thirty to forty feet."

"Q. Now, Mr. Eager, judging from your experience in the operation of cars of the type and pattern and equipped in the manner that this car was equipped, as you have described to the jury, going at the rate of speed that you have described—eight, nine or ten miles per hour—under ordinary conditions, that is, under conditions where the rail was dry and your wheels were dry and everything is in good normal condition for stopping the car, within about what distance can a car ordinarily be stopped by using the appliances that you had to use? A. Well, from my experience I should say from sixty to eighty feet.

"Mr. Boyle: That is, on a dry rail? A. Yes, sir.

"Q. Mr. Eager, what difference if any does it make in the distance in which you could stop a car, if the rail be wet and gummy and in the condition that you say this track was in on that night? Can you stop it quicker or does it take longer to stop it? A. It takes longer.

"Q. Well, with the rail in the condition that you say that rail was on that evening, within about what distance according to your experience and judgment would you say that a car could ordinarily be stopped with the appliances which you had—the rail wet and gummy, as you say it was on this evening? A. From 100 to 125 feet."

On cross-examination the witness testified:

"Q. Mr. Eager, you say that the window in your vestibule was wet and misty and cloudy? A. Yes, sir.

"Q. So you couldn't see out very well? A. Yes, sir.

"Q. And you didn't wipe it off with a cloth so you could see out, did you? A. I hadn't that trip.

"Q. So you had your window misty and cloudy and hadn't wiped it off, and you were running on the wrong track, weren't you? A. Yes, sir.

"Q. And you were running at from nine to ten miles an hour? A. Yes, sir.

"Q. And you could only see about thirty feet ahead of you—is that right? A. Yes, sir.

"Q. And you could stop your car in the neighborhood of 80 to 90 feet—is that right? A. Yes, sir.

"Q. Or 100 to 120 feet—is that right? A. With that condition."

In passing on the demurrer, we must draw from the evidence every reasonable inference in support of the cause of action asserted. Therefore, we assume as proved the existence of the following facts: First, young Shipley was in a public street and was traveling eastward on the north track of a cable railroad on which none but westbound cable cars had been run and he had no knowledge, nor reason to think, that an eastbound electric car would be run on that track. Second, an eastbound electric car was run on that track at from eight to ten miles per hour and in nearing the pedestrian who was unconscious of its approach, its motorman did not slacken speed nor sound any warning. Third, had the motorman been looking ahead, he could have seen the pedestrian in time either to have stopped the car or to have given warning signals by sounding the bell.

The mere recital of these facts constitutes a striking and indisputable charge of negligence against the motorman. He was running a powerful and dangerous vehicle in a public street of a city, where he was bound to anticipate the presence of travelers whose right to use the street was equal to his own. Had the car been on the right track for eastbound cars, it would have been his duty to keep a close lookout and to take prompt measures to avoid endangering travelers as well as to extricate them from peril should they become imperilled from any cause. Knowing that in running the car on the track for westbound cars he was departing from a custom of long standing and that people using the street were likely to be misled and thrown off their guard by his act, it devolved on him, if he would act with rea-

sonable care, to proceed cautiously, to give frequent warnings of his movements and, until the contrary appeared, to assume that a pedestrian on the track was not aware of the fact that a car was approaching on that track from the wrong direction. Instead of doing these things, obviously suggested to him by reasonable care and prudence, he deliberately ran a man down without warning, whose appearance must have proclaimed his oblivion to impending destruction. Of course these strictures on the conduct of the motorman are based on the evidence adduced by plaintiff, but when we turn to the testimony of the motorman himself, we find no exculpation but instead an accusation of negligence.

True, he pictures the young man not as walking along the track in front of the car, but as coming into the range of his vision from the south side and directly in front of the car. For present purposes, we reject this evidence because it is opposed to the evidence of plaintiffs, but we accept his admission that under conditions which prevented him from seeing ahead a greater distance than thirty or forty feet he was driving his car along a public street at a rate of speed which precluded a stop being made in less than one hundred feet. That was not holding the car in proper control, but was an assertion of a paramount right to the use of the street. It was playing with death and using the lives of human beings as playthings. Under the evidence of plaintiffs, that wrongful act, coupled with the neglect of the motorman to ring the bell, was the proximate cause of the death.

But it is argued by defendant that the young man should be pronounced in law guilty of contributory negligence. Under the peculiar circumstances disclosed, we think the denomination of his conduct was an issue for the triers of fact. Considering the lateness of the hour, the darkness and the weather conditions, it was not negligence *per se* for him to use the roadway in prefer-

ence to the sidewalk. That is a common practice of belated travelers on the highway and the law does not condemn it as negligence. He had a right to use that part of the roadway occupied by the west-bound track but it was his duty to keep a close lookout for cars and to leave the track for them to pass. The jury were entitled to infer that in using the track for west-bound cars he acted with reasonable care, since thereby he would face approaching cars instead of having his back to them. He was not bound in law to anticipate that defendant would reverse a custom of long standing by running eastbound cars on that track. Evidently, he was taken by surprise and the only question remaining is whether or not the noise of the car and its headlight would have warned a reasonably careful and prudent person in his situation in time to have enabled him to save himself. It is in evidence that the power was shut off at Benton boulevard and that the car coasted thence to the place of the collision. In view of the facts that in coasting such cars do not make as much noise as when they are running under power; that the weather conditions were unfavorable, and that the young man had his back to the car and had no reason to think it would come from that direction, we cannot say that he must have been negligent not to have known of its approach before it became too late to escape. We reach the same conclusion with reference to his failure to be warned by the headlight. Admittedly, it was a weak light; there were other lights in the street—one of which he was facing—and the air was misty. Under such conditions, it is fair to infer that an ordinarily careful and prudent person in his situation would not have been warned by the headlight. We conclude that the evidence of plaintiff tends to show that the peril and its tragical result were created by the sole negligence of defendant and that young Shipley was free from contributory negligence.

Further, we express the opinion that the evidence abundantly supports the conclusion that even if the jury found, as a matter of fact, that contributory negligence did aid in the creation of the peril, it was superseded in the causal chain by negligence of the motorman under the "humanitarian doctrine." There is evidence to the effect that the motorman, had he been attentive to the way ahead, would have seen the young man in time to have saved him by sounding a warning and checking speed, but that he put forth no effort to save him. On this hypothesis, a case was presented for the jury to solve. These considerations lead to the conclusion that no error was committed by the trial court in overruling the demurrer to the evidence.

At the request of plaintiff, the court instructed the jury as follows:

"A. The plaintiffs make the following claims in this case:

"1. That they were the parents of Frank P. Shipley.

"2. That at the time of his death he was a minor and never married.

"3. That he was killed by a car on May 23, 1903, while walking eastward on or perilously near the north tracks of the street railway track on Ninth street near Indiana avenue in Kansas City, Missouri.

"4. That defendant was then operating the car which it is claimed killed him.

"Before the plaintiff can recover in this case you must find from the evidence that these claims are true, and that the death of Frank P. Shipley was the direct result of negligence (if any) of the defendant, as specified in the other instructions herein.

"B. If your finding from the evidence on the issues set forth in paragraphs 1, 2, 3 and 4 of instruction A is in favor of the plaintiffs, and if you further find from the evidence that the defendant was negligently running the car in question at a rate of speed which was not reasonably safe under the particular circum-

stances which you find existed in this case, and that such negligence (if any) directly contributed to cause the death of said Frank P. Shipley, then your finding should be for the plaintiffs, provided you further believe from the evidence that said Frank P. Shipley was not guilty of negligence directly contributing to cause his death.

"If your finding is for the plaintiffs on the issues set forth in this instruction and instruction A, then your verdict will be in favor of the plaintiffs and against the defendant in the sum of five thousand dollars.

"C.   In the absence of all evidence tending to show whether Frank P. Shipley was in the exercise of due care at and prior to the time he was killed, the presumption would be that he was. But that presumption may be rebutted by circumstantial evidence, and it is a question for the jury whether the facts and circumstances proved in this case rebut that presumption. And if you find that they do, you should find that he was not in the exercise of due care; but if the facts and circumstances fail to rebut such presumption, then you should find that he was in the exercise of ordinary care.

"D.   By the term 'ordinary care' and reasonable care as used in these instructions, is meant such care as would be used by an ordinarily prudent person under the same or similar circumstances.   By the term 'negligence' as used in these instructions is meant the failure to use ordinary care.

"E.   Even though the jury believe from the evidence that Frank P. Shipley was guilty of negligence in going upon or perilously near to the track upon which he was injured, yet if, from the evidence you find the issues set forth in paragraphs 1, 2, 3 and 4 of instruction A in favor of the plaintiffs, and, if you further find from the evidence that after Frank P. Shipley was guilty of such negligence (if any) the motorman of defendant in charge of said car discovered or by the

use of ordinary care could have discovered his condition, and the danger of the same, if it was dangerous, and could have avoided injuring him, by the use of ordinary care, and failed to do so, then such negligence of said Frank P. Shipley is no defense in this action, and your finding should be for the plaintiffs in the sum of five thousand dollars.

"F.    The jury are instructed that so much of the evidence of R. B. Jones as refers to the finding of a pencil on or near the track on May 23, 1903, is withdrawn from your consideration, and you are not to consider the same in arriving at a verdict."

The most serious objection offered to this instruction is that it submits the hypothesis first, that the peril of the decedent was created by the sole negligence of defendant without the aid contributory negligence, and, second, that the death was caused by the negligence of defendant under the humanitarian doctrine. The argument is that these hypotheses are so inconsistent they cannot be considered in the same case and the cases of Hof v. Transit Co., 213 Mo. 467, and Krehmeyer v. Transit Co., 220 Mo. 639, are cited in support of the argument. Of course, if the Supreme Court has so decided this question that would be an end to all discussion here. We would follow the Supreme Court, regardless of what our own views might be, but we do not understand the Supreme Court have decided the question as defendant argues they have. The Krehmeyer case is the last decision dealing with the subject to which our attention has been directed. The majority opinion in that case, written by WOODSON, J., and concurred in by BURGESS, FOX and GRAVES, JJ., does contain expressions which lend support to the contention of defendant. But there was a dissenting opinion filed by VALLIANT, J., and concurred in by GANTT and LAMM, JJ., which took sharp issue with the majority opinion. The concurrence of Judge GRAVES with the majority was by a separate concurring opinion in which he stated

that he concurred in the result but did not follow all the reasoning of his brother WOODSON. An examination of that opinion discloses that Judge GRAVES did not endorse the view that the issue of whether the peril was produced by the sole negligence of the defendant and that of whether the defendant was negligent under the humanitarian doctrine are so inconsistent that both may not be contested in one action. Consequently the judges by a majority of four to three were against the doctrine now pressed by defendant and which, as we have said, finds some support in the opinion of WOODSON, J.

The writer thinks the misunderstanding of this question probably has been engendered by the erroneous idea that in a cause of action based on the humanitarian doctrine, necessarily the court must start with the presumption that the peril was created either by the sole negligence of the injured person or, at least, in part by his contributory negligence. The humanitarian doctrine does not take into account the question of how the peril was created (Grout v. Railway, 125 Mo. App. 552), but takes the imperiled man where it finds him, regardless of whose fault placed him there, and says to the defendant: "If you saw, or in the exercise of reasonable care, should have seen his peril, you should have done all you reasonably could have done to save him and if you failed thus to exert yourself, you must answer in damages for the injury."

In this view of the humanitarian doctrine, it is a logical error to say that the issues we are discussing are inconsistent. Contributory negligence is a defense —an affirmative defense—and it is perfectly logical and consistent for the plaintiff to say to the defendant: "Without fault of mine, you negligently placed me in peril, but even if I were at fault in being caught in that position, you had ample opportunity to observe my peril and save me, but instead of doing what a humane man would have done in your situation, you wantonly or

negligently ran me down." We say the issues submitted in the instructions may be contested in the same action.

Other objections to the rulings of the court on the instructions are answered in what we have said. There is no prejudicial error in the record and accordingly the judgment is affirmed. All concur.